IMPULSE TRADING, INC., Plaintiff,

v.

NORWEST BANK MINNESOTA, N.A., a Minnesota corporation; The State Bank of India, A National Bank Organized pursuant to the Laws of the State of India; Bank for Foreign Economic Relations of the U.S.S.R. (Vnesheconombank USSR), a National Bank Organized pursuant to the Laws of the Union of Soviet Socialist Republics, and its successor, the Central Bank of Russia, Defendants.

Civ. No. 4–93–252.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 16, 1994.

partial summary judgment and denies in part and grants in part defendant's motion for summary judgment.

## BACKGROUND

Plaintiff Impulse Trading, Inc. ("Impulse") is a closely held corporation headquartered in and organized under the laws of Minnesota. Mark Stipakov ("Stipakov") is the president and sole owner of Impulse and its principal business is the sale and export of goods to the former Soviet Union. Defendant Norwest Bank Minnesota, N.A. ("Norwest") is a national bank incorporated in Minnesota. Defendant State Bank of India ("State Bank") is a commercial bank organized under the laws of India and headquartered in Bombay, India. Approximately 98 percent of the stock of State Bank is owned by the Federal Reserve Bank of India, which is under the control of the Indian government. Defendant Bank for Foreign Economic Relations of the U.S.S.R. and its successor, the Central Bank of Russia (collectively "Bank of Russia"), has not made an appearance in this lawsuit.

On November 1, 1991, Impulse entered into a contract to supply Petrospek, a Soviet–American–British joint venture, with photocopiers and other computer-related equipment. Petrospek is located in St. Petersburg, Russia and is organized under the laws of the former Soviet Union. Pursuant to the contract, Petrospek was to pay Impulse for the office equipment by means of wire transfers between the Bank of Russia, State Bank and Norwest. Specifically, the contract required an advance of six million rupees to be paid to Impulse by wire transfer during the 45 day period after the contract was signed. This was to be followed by a payment of 24 million rupees. Norwest conducted two similar transfers with Impulse in 1991. In those transfers, Soviet companies paid Impulse by transferring money from their accounts with the Bank of Russia in Moscow to the Bank of Russia's account with State Bank in India. State Bank then transferred the money in the form of rupees to Norwest's account in India. Norwest, after it received notice of the credit in India, transferred the funds to Impulse at the existing exchange rate.

Andrew Peter Engebretson, Engebretson & Associates, St. Paul, MN, for Impulse Trading Inc.

Richard T. Thomson, Lapp Laurie Libra Abramson & Thomson, Minneapolis, MN, for Norwest Bank Minnesota, N.A.

Ronald Marvin Diker, Diker Law Office, Minneapolis, MN, John W. Moore, Moore Law Office, Cyriac D. Kappil, Kappil Law Office, Chicago, IL, for State Bank of India.

## ORDER

DOTY, District Judge.

This matter is before the court on a motion for partial summary judgment brought by plaintiff Impulse Trading and a motion for summary judgment brought by defendant Norwest Bank Minnesota. Based upon a review of the file, record and proceedings herein, the court denies plaintiff's motion for

In late November or early December, Impulse informed Norwest to expect a deposit of approximately six million rupees into Norwest's account at State Bank's office in Bombay, India. On November 20, 1991, Petrospek instructed its bank, the Bank of Russia, to transfer 6,054,925 Indian rupees from Petrospek's account in the Soviet Union to Norwest's account at State Bank. On November 21, 1991, the Bank of Russia, to effectuate this instruction, telexed State Bank's offices in New Delhi instructing State Bank to credit Norwest's account in Bombay with the funds, reference Impulse, and to debit the Bank of Russia's account with State Bank in New Delhi.

On November 27, 1991, State Bank debited the Bank of Russia's account in India; however, it did not transfer any funds to Norwest's account until December 19, 1991. The record does not indicate the reason for this delay nor does the record indicate how State Bank's offices in New Delhi instructed State Bank's offices in Bombay to credit Norwest's account. On December 19, 1991 State Bank credited Norwest's account for 6,053,350 rupees. State Bank, however, did not give Norwest any notification of this credit. On December 28, 1991, State Bank's offices in New Delhi informed State Bank's offices in Bombay by telex that the transfer of funds to Norwest's account "was in error." This communication between State Bank offices, however, was not communicated to Norwest in the United States.

On January 21, 1992, Norwest received its December bank statement from State Bank which contained a credit in the amount 6,053,350 rupees. The statement does not reference Impulse. In light of the contacts between Norwest and Stipakov regarding his anticipation of a six million rupee credit, Norwest assumed the credit belonged to Impulse. Accordingly, Norwest called Impulse on January 21, 1992 and transferred the dollar equivalent, $231,929.12, into Impulse's account. Norwest also began to make arrangements to exchange the rupees for dollars by arranging for the sale of the rupees to Fidelity Bank in New Jersey ("Fidelity Bank"). On January 23, 1992 Norwest sold the rupees to Fidelity Bank. According to

Norwest, it instructed State Bank to transfer the rupees to Fidelity Bank on January 23, 1992. The rupees, however, remained on deposit in Norwest's account in India.

On January 31, 1992, State Bank's offices in New Delhi reversed the credit to State Bank's offices in Bombay. That same day, State Bank reversed the December 1991 credit to Norwest's account. This reversal occurred more than a month after notification from the New Delhi office that the debit was erroneous and 10 days after Norwest received notice via its bank statement of the credit. Norwest was not notified of this activity on its account. In late February 1992, Norwest received its January 1992 bank statement from State Bank. That statement reflected the January 31, 1992, debit to Norwest's account of 6,053,350 rupees. Norwest's first response was to contact Stipakov and inform him of the reversal. During this conversation, Norwest asked Stipakov to contact Petrospek in Russia to discover the reason for the reversal. According to Norwest, it also telexed State Bank on February 26, 1992 inquiring about the reversal; however, that telex is not part of the record. State Bank did not respond until March 25, 1992. In response, the telex from State Bank simply stated that the deposit was an erroneous credit and that at the request of State Bank's New Delhi office, the funds were returned to New Delhi. On March 25, 1992, Norwest told Impulse that the "deposit was in error." Norwest, however, took no action regarding the funds in Impulse's account. On March 26, 1992, Norwest telexed the manager of State Bank's international banking department in New Delhi requesting an explanation of the reversal.

On March 26, 1992, in a transaction unrelated to the one involving Petrospek, Impulse applied to Norwest for a letter of credit in the amount of $98,200 in favor of Fair Age Electronics for the purchase of 5,000 telephone answering machines. Norwest issued the line of credit; however, it placed a hold on Impulse's account in the amount of $98,200 as security for the letter of credit. This transaction occurred after Norwest had informed Impulse of the problems with the

Petrospek transfer but before Norwest debited Impulse's account.

On April 29, 1992, State Bank confirmed that the December 1991 credit was a mistake without stating the underlying rationale, concluded that Norwest's account in India was properly debited. State Bank also informed Norwest that its account contained insufficient funds to complete the transfer to Fidelity Bank which Norwest had ordered on January 23, 1992. According to Norwest, it was able to instruct State Bank to disregard the sale of the rupees to Fidelity Bank. On April 30, 1992, Norwest debited Impulse's account for $231,929.12. On May 12, 1992, Norwest again debited Impulse's account in the amount of $2,293.00 for interest. As a result of Norwest's debits, Impulse maintained insufficient funds to support the $98,200 hold on its account which secured the letter of credit. Norwest, however, did not notify Impulse of the debits nor did it notify Impulse of the shortage. Impulse learned of the insufficient funds in its account in mid-May when Stipakov attempted to transfer funds to a third party. At this point, Impulse deposited sufficient funds to secure the letter of credit.

Impulse commenced this action against the defendants in Minnesota state court based on Norwest's reversal of the January 1992 credit. State Bank removed the action pursuant to 12 U.S.C. § 632 and 28 U.S.C. § 1441(b).[1] After removal, State Bank filed a motion to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. The court, by order dated December 6, 1994, granted State Bank's motion to dismiss. The Bank of Russia, although it has not appeared in this lawsuit, informed Impulse in March 1993 that pursuant to an agreement between the Bank of Russia and State Bank, the Bank of Russia's Indian account is kept in non-convertible Indian rupees. The funds in that account, therefore, cannot be transferred to accounts of firms from other countries in freely convertible currency. The Bank of Russia asserts that the agreement between Impulse and Petrospek could not be effectu-

ated through India due to the agreement between India and Russia. Although the Bank of Russia recredited Petrospek's account in the amount of 6,054,925 rupees, as of March 1993, the Bank of Russia had not received any funds from State Bank.

Impulse alleges four causes of action against Norwest: conversion, breach of fiduciary duty, wrongful setoff and negligence. In this motion, Impulse moves for partial summary judgment on its claim for conversion. Impulse argues that under Article 4A ("Article 4A") of the Uniform Commercial Code, as adopted in Minnesota, funds transfers are irrevocable as against the final recipient except in narrowly proscribed circumstances not present in this case, and, therefore, the revocation of the transfer constitutes conversion.

Norwest moves for summary judgment on all issues. First, Norwest argues that Article 4A does not apply; therefore, the transfer is not necessarily irrevocable. Second, Norwest asserts it is not liable for common law conversion as it has a right to the funds under the laws of mistake and restitution. Third, Norwest argues that Impulse's claim of breach of a fiduciary duty fails as Norwest was not Impulse's agent in the transaction. Fourth, Norwest argues that it did not setoff any amount. Finally, Norwest asserts that it was not negligent.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no

---

1. Section 632 of Title 12 provides federal courts with original jurisdiction over actions arising out of transactions involving international or foreign banking and where a corporation organized under the laws of the United States is a party. 12 U.S.C. § 632.

issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2511.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### A. *Conversion*

■ Both Norwest and Impulse move for summary judgment on the issue of conversion. Conversion is "the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Rudnitski v. Seely,* 452 N.W.2d 664, 668 (Minn.1990); *Larson v. Archer–Daniels–Midland Co.,* 226 Minn. 315, 32 N.W.2d 649, 650 (1948). To state a cause of action for conversion, a plaintiff must establish: (1) ownership of the goods or a right to the goods; and (2) that the defendant's actions were inconsistent with that right. *See Larson,* 32 N.W.2d at 650.

### 1. *Right to the Funds*

■ Norwest argues that Impulse cannot establish a right to the funds. Norwest asserts that Article 4A governing funds transfers is inapplicable; accordingly, the funds were revocable as they were mistakenly transferred. Norwest also asserts it has a right to the funds under the law of restitution which defeats Impulse's attempt to establish a right to the funds. Impulse argues that the credit to its account was final and irrevocable under Article 4A; therefore, it can establish a right to the funds. Impulse also argues that under the law of restitution it has a right to the funds. The court initially addresses the applicability of Article 4A to this transaction.

The National Conference of Commissioners on Uniform State Laws and the American Law Institute promulgated Article 4A of the Uniform Commercial Code to handle electronic funds transfers. Minnesota adopted Article 4A in 1990 and it became effective January 1, 1991. *See* Minn.Stat. Ann. § 336.4A–101 (1992). Article 4A was drafted specifically to remedy the failure of Article 4 to deal adequately with conflicts relating to funds transfers. *See* Minn.Stat. § 336.4A–102, comment (1992); *Myrin Institute, Inc. v. International Nederlanden Bank NV,* Civ. No. 92–5884, 1992 WL 395605 (S.D.N.Y. Dec. 17, 1992). The drafters of Article 4A believed that funds transfers were a unique form of payment that required a unique body of law, therefore, the act specifically excluded consumer transactions governed by the Federal Electronic Funds Transfer Act of 1978. Minn.Stat. § 336.4A–108 (1992). The act sought to achieve a number of important policy goals regarding the regulation of funds transfers including national uniformity, as well as speed, efficiency, certainty and finality. *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189, 195 (1991).

Few cases have addressed the scope of Article 4A. Norwest argues that Article 4A does not apply to this transaction as it never received a "payment order" from State Bank; rather, the instruction to transfer came from its customer, Impulse. Norwest asserts that it is the existence of a "payment order" which alerts the bank that Article 4A applies. The court finds that Norwest's attempt to place this transaction outside of Article 4A is not persuasive. The scope of Article 4A is determined by the definitions of both "pay-

ment order" and "funds transfer." A "funds transfer" is defined as:

> [T]he series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

Minn.Stat. § 336.4A–104(a) (1992). Norwest correctly points out that funds transfers generally involve a series of payment orders between financial institutions and the court agrees that, in this statutory scheme, a payment order is an integral part of an Article 4A transaction. The payment orders are the communication, either written, oral or electronic, by which a sender gives the instruction to the sender's bank to pay, or cause another bank to pay, funds to a beneficiary. Minn.Stat. § 336.4A–103(a) (1992).[2] Generally, payment orders are the means by which a financial institution is informed of its obligation to pay a beneficiary or transfer funds to a beneficiary's bank. Payment orders insure that the parties fulfill their obligation to effect the transfer. The court finds, however, that the absence of a payment order in a funds transfer transaction does not remove it from the scope of Article 4A. In a case such as this, the presence or absence of the payment order and whether it is accurate or inaccurate, authorized or unauthorized, provides the means by which the parties to the transfer allocate possible losses. Without the instruction to pay the beneficiary from

the bank which transfers the funds, the beneficiary's bank is under no obligation to pay the beneficiary the funds.[3] The court therefore agrees with Impulse that an analysis of the transaction under Article 4A determines whether Impulse had a right to the funds which were transferred into its account in January 1992.

 Article 4A provides that payment to the beneficiary occurs when, after the beneficiary's account has been credited, the beneficiary's bank notifies the beneficiary that it can withdraw the credit or the funds are otherwise made available to the beneficiary. Minn.Stat. § 336.4A–405(a)(i) and (iii) (1992). Significantly, a comment to Article 4A states that, "if a beneficiary bank releases funds to the beneficiary before it receives payment from the sender of the payment order, it assumes the risk that the sender may not pay the sender's order because of suspension of payments or other reason." Minn.Stat. § 336.4A–405(c), comment 2 (1992). The act allows the beneficiary's bank to protect itself against this risk by delaying acceptance. *Id.* Article 4A also provides that a transaction is irrevocable, after payment has been made to the beneficiary, except as provided by Article 4A. *Banque Worms,* 568 N.Y.S.2d at 547, 570 N.E.2d at 195. In the interest of certainty and finality, Article 4A provides only limited exceptions to the general rule of finality when a transfer is made using the funds-transfer system. *See* Minn.Stat. § 336.4A–405(d) & (e) (1992).

In support of its summary judgment, Impulse argues that Norwest completed an irrevocable transfer to Impulse's account when Norwest transferred $231,929.12, the dollar equivalent of 6,053,350 rupees, into its account. As this transfer is irrevocable, Im-

---

**2.** Section 336.4A–103 provides:
(1) "Payment order" means an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
 (i) the instruction does not state a condition to payment to the beneficiary other than time of payment,
 (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender, and
 (iii) the instruction is transmitted by the sender directly to the receiving bank or to an

agent, funds-transfer system, or communication system for transmittal to the receiving bank.
Minn.Stat. § 336.4A–103(a)(1) (1992).

**3.** Article 4A provides that, upon acceptance of a payment order by a beneficiary's bank, the bank is obligated to pay the beneficiary the amount of the payment order unless the order is effectively canceled in accordance with the provisions of § 336.4A–211(c)(2). *See* Minn.Stat. § 336.4A–404(a) (1992).

pulse argues it has a right to the funds. Impulse asserts that Petrospek was the originator or sender of a payment order on November 20, 1991 which instructed its bank, the Bank of Russia, to pay Norwest funds for the benefit of Impulse. Norwest denies the money credited to Impulse's account was the result of a transfer from Petrospek. Norwest points out that the amount referenced in the instruction issued by Petrospek is 6,054,925 rupees. The amount which appeared on Norwest's bank statement was 6,053,350 rupees. Norwest also argues that the contract only called for an advance of 6,000,000 rupees. The court finds, therefore, that several questions of fact exist as to whether the funds transferred originated from Petrospek. Accordingly, the court concludes that it cannot determine on this record whether Impulse has a right under Article 4A to the funds deposited in January 1992.

### 2. Actions Inconsistent with Impulse's Right in the Funds

■ Norwest argues that, notwithstanding any right that Impulse may have in the funds, the conversion claim of Impulse must fail. Specifically, Norwest argues that it never exercised dominion over the rupees transferred by Petrospek as the rupees never left the control of State Bank. The court disagrees. It is immaterial whether Norwest exercised any control over the funds in India. Impulse claims a right to the $231,929.12 transferred to its account in Minnesota and asserts that the reversal of that deposit is an exercise of dominion inconsistent with the right of Impulse to the funds.

■ Norwest also argues that it has a right to the funds under the law of restitution which defeats any rights Impulse may have and which justified the debit to Impulse's account. The court assumes, without deciding, that Norwest may have such a right to the funds under general principles of mistake and unjust enrichment if the funds were

not part of an Article 4A transfer from Petrospek. *See Bank of America Nat'l Trust and Savs. Assoc. v. Sanati*, 11 Cal.App.4th 1079, 14 Cal.Rptr.2d 615, 618 (1992). The court finds, however, that even if Norwest had this right to the funds, it does not preclude Impulse from establishing that it had a possessory right to the funds.[4] First, the court notes that nothing in the customer agreement between Norwest and Impulse provides that funds transfers are provisional.[5] Second, Norwest has cited no authority for the principle that it can unilaterally debit its customer's account even if it is entitled to restitution of the funds. To the contrary, the case law suggests that Norwest's right to the money, if any, is in the nature of an action to recover the money paid to Impulse. *See Shawmut Worcester County Bank v. First American Bank & Trust*, 731 F.Supp. 57, 59 n. 2 (D.Mass.1990); *Mellon Bank, N.A. v. Securities Settlement Corp.*, 710 F.Supp. 991, 998 (D.N.J.1989).

For example, *Shawmut* involved an erroneous transfer of funds which was discovered by the transferor bank 106 days after the transaction occurred. *Id.* at 58. Upon discovery of the mistake, the transferor bank credited its customer's account and asked the transferee bank to return the mistakenly transferred funds. The transferee bank requested permission to debit its customer's account. The customer refused. Accordingly, the transferee bank did not return the money. The transferor bank then instituted an action against the transferee bank and also instituted an action against the customer. The action against the customer for the amount of the mistakenly transferred funds was successful. The court, in granting the transferee's motion for summary judgment on the issue of conversion, noted that "[h]ad [the transferee bank] removed $10,000 from that account without authority, it could well have effected a conversion, because [the customer] arguably has possessory rights in the money." *Id.* at 59 n. 2. Accordingly, the

---

4. In light of this determination, the court does not address whether the discharge for value rule is the law in Minnesota, nor does the court address whether a mistake of fact analysis would entitle Impulse to retain the funds transferred.

5. The court also notes that the principle of finality can be seen throughout the Uniform Commercial Code. *See e.g.,* Minn.Stat. § 336.4–303 (1992).

court concludes that summary judgment is inappropriate on the issue of conversion, as Impulse has also presented a question of fact regarding whether Norwest's action of debiting its account was inconsistent with any rights Impulse may have to the funds.

### B. *Breach of Fiduciary Duty*

The relationship between a bank and its customer is one of debtor and creditor, with the customer as the creditor and the bank the debtor. *Hurley v. TCF Banking and Savings, F.A.,* 414 N.W.2d 584, 587 (Minn.Ct.App.1987). This relationship is not one of agent and principal and therefore does not give rise to a fiduciary relationship. *See Stenberg v. Northwestern Nat'l Bank of Rochester,* 307 Minn. 487, 238 N.W.2d 218 (1976); *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 623 (1972). A fiduciary duty may exist, however, where there is a special relationship between the parties. *Klein,* 196 N.W.2d at 623. Impulse argues that Norwest breached its fiduciary duty when it debited its account without authorization. The court finds that this argument is based on the debtor and creditor relationship which exists between a bank and its customer. *See Middle East Banking v. State Street Bank Int'l,* 821 F.2d 897 (2d Cir.1987). The court concludes that Impulse has failed to allege a special relationship which gives rise to a fiduciary duty. Accordingly, the court grants Norwest's summary judgment motion on the issue of breach of fiduciary duty.

### C. *Wrongful Setoff*

Banks have the right of setoff as to debts the customer owes to the bank against the customer's account. *See Nietzel v. Farmers and Merchants State Bank of Breckenridge,* 307 Minn. 147, 238 N.W.2d 437, 438 (1976). This right is merely a balancing of accounts between debtor and creditor. *Id.* The agreement between Impulse

and Norwest also provided Norwest with the right to setoff any debts or liabilities Impulse owed to Norwest.[6] Impulse stated in its complaint that the act of debiting its account in April in order to recover the funds transferred in January constituted a wrongful setoff as it did not owe a debt to Norwest. Norwest denies that it setoff any amount to the funds in Impulse's account. Norwest argues that it merely debited Impulse's account for the January 1991 erroneous credit, and the fact that this caused a shortage on the account, did not constitute a setoff. In light of the court's decision that there is a question of fact regarding whether Norwest was entitled to debit Impulse's account, the court concludes that summary judgment is inappropriate on this point.

### D. *Negligence*

Impulse also argues that Norwest was negligent by failing to adequately investigate the statements of State Bank regarding the December 1991 deposit. Impulse also alleges that Norwest negligently failed to obtain a "CIB indemnification" from State Bank. Norwest moved for summary judgment on this point, but as neither party has presented any argument, the court declines to grant Norwest's motion for summary judgment on the negligence claim of Impulse.

### CONCLUSION

Based on a review of the record, file and proceedings, and the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for partial summary judgment is denied;

2. Defendant's motion for summary judgment is granted on the issue of fiduciary duty and denied in all other respects.

**6.** The agreement provided:

You understand that we have a right of "setoff." This means that we may charge any of your accounts (including time deposits) for any debts or liabilities you owe us, whether due or not. This includes both secured and unsecured debts and debts you owe individually or together with

someone else. If there is more than one depositor on your account, this includes the debts and liabilities of any of you. We may exercise our right of setoff at any time and for any reason as allowed by law. We may consider this Agreement as your consent to exercise our right of setoff should any law require your consent.