**IMPULSE TRADING, INC., Plaintiff,**

v.

**NORWEST BANK MINNESOTA, N.A., a Minnesota Corporation; The State Bank of India, a National Bank organized pursuant to the Laws of the State of India; Bank for Foreign Economic Relations of the U.S.S.R. (Vnesheconombank SSSR), a National Bank organized pursuant to the Laws of the Union of Soviet Socialist Republics, and its successor, the Central Bank of Russia, Defendants.**

Civ. No. 4–93–252.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 14, 1995.

Andrew P. Engebretson, St. Paul, MN, for plaintiff.

Richard T. Thomson, Lapp, Laurie, Libra, Abramson & Thomson, Minneapolis, MN, for defendants.

## FINDINGS OF FACT

SPENCER WILLIAMS, District Judge.*

1. Plaintiff Impulse Trading, Inc. ("Impulse") is a Minnesota corporation that engages in trade with companies in the former Soviet Union. Marc Stipakov is the president, sole shareholder and only employee of Impulse.

---

* The Honorable Spencer Williams, of the United States District Court for the Northern District of California, is sitting by designation.

2. Impulse does its banking with Defendant Norwest Bank Minnesota, N.A. ("Norwest").

3. In January 1991, Stipakov traveled to Russia to arrange a sale of computer equipment to Ilka, a Russian corporation. Because Russian rubles are not readily convertible into Western "hard" currencies such as the dollar or pound, the parties agreed that the equipment would be paid for in Indian rupees. At the time of the agreement, Stipakov intended to open an account at the State Bank of India ("SBOI") into which the rupees would be deposited. Stipakov then planned to exchange the rupees into dollars and have them transferred to his Norwest account in the United States.

4. Upon returning to the United States, Stipakov learned that he could not open an individual account with SBOI. Consequently, he called Norwest to inquire about how the transaction could be completed.

5. Rhonda Grubbe, in Norwest's foreign exchange department, informed Stipakov that Norwest had an account with SBOI, and that he could have the rupees deposited there. Grubbe also told him that once the rupees were deposited at SBOI, Norwest could exchange them for dollars and credit Stipakov's account.

6. The funds transfer proceeded as follows. Ilka instructed its bank, Vnesheconombank Bank SSSR ("Bank of Russia"), to transfer the rupees to Norwest's SBOI account. To carry out this instruction, the Bank of Russia telexed a payment order to SBOI's New Delhi office on February 26, 1991 directing SBOI to debit the Bank of Russia's account in New Delhi and to credit Norwest's account in Bombay. SBOI followed these instructions and issued a payment order crediting Norwest's account on March 11, 1991.

7. While these transactions were occurring, Stipakov called Ann Levi in Norwest's reconciliation department to alert her that he was expecting rupees to be deposited in Norwest's SBOI account. He also called back several times to ask whether the rupees had arrived.

8. Subsequently, Levi received Norwest's March 1991 bank statement from SBOI indicating that a deposit of rupees had been made to Norwest's account. Levi relayed this information to Stipakov, who said that the rupees belonged to him. Relying on this representation, Levi called Rhonda Grubbe in Norwest's foreign exchange department and told her to exchange the rupees for dollars. Stipakov spoke directly to Grubbe and arranged to have the newly converted dollars deposited into his Norwest account.

9. Although a payment order referencing Impulse accompanied Norwest's March 1991 bank statement from SBOI, no one at Norwest who was involved in this series of transactions ever saw or relied on it.

10. In mid–1991, Stipakov arranged a similar sale to another company in Russia. The method of payment involved identical funds transfers.

11. Then, on November 1, 1991, Impulse entered into a contract to supply Petrospek, a Soviet–British joint venture located in St Petersburg, Russia, with photocopiers and computer equipment. The contract required Petrospek to make an advance payment of 6 million rupees during the 45–day period after the contract was signed. After shipment of the goods, Petrospek would make a payment of an additional 24 million rupees. The method of transferring the funds was to be the same as for Impulse's previous transactions with Ilka.

12. Before receiving the advance payment from Petrospek, Stipakov shipped the copiers and computer equipment to Russia.

13. In late November or early December of 1991, Stipakov informed Levi to expect a deposit of approximately 6 million rupees into Norwest's SBOI account. He called back repeatedly to ask her if the money had arrived yet.

14. On November 27, 1991, SBOI debited the Bank of Russia's account in the amount of 6,053,350 rupees. On December 19, 1991, 6,054,925 rupees were deposited in Norwest's SBOI account. The difference between the two amounts resulted from foreign currency exchange rate fluctuations.

15. Thereafter, on December 28, 1991, SBOI's New Delhi office informed the Bombay office that the credit to Norwest's account "was in error". SBOI took no immediate action to remedy the error, however, and did not notify Norwest of either the credit or the later determination that the credit was in error.

16. On January 21, 1992, Levi reviewed Norwest's monthly statement from SBOI. The statement contained a credit of 6,054,925 rupees, but did not reveal the source of the credit or make any reference to Impulse. Accompanying the statement was a payment order that did not reference Impulse either.

17. Due to previous conversations with Stipakov, Levi assumed that the credit belonged to him. Based on this belief, Levi called Stipakov and informed him that his rupees had arrived. She then called Grubbe and told her to exchange the rupees and deposit dollars into Stipakov's account. Grubbe did so, resulting in a $231,929.12 credit to Stipakov's account.

18. On January 31, 1992, SBOI reversed the 6,054,925 rupee credit to Norwest's account. Levi learned of the reversal upon receiving Norwest's January 1992 SBOI bank statement. She immediately informed Grubbe and Michael Schaefer, the manager of Norwest's foreign exchange department. Schaefer told Levi to contact SBOI to determine the cause for the reversal, which she did by telex on February 26, 1992. Levi also called Stipakov to see if he was aware of any problems on the Russian end of the transaction.

19. SBOI responded to Levi's telex on March 25, 1992 by stating simply that the "deposit was in error".

20. The next day, March 26, 1992, Levi sent another telex requesting an explanation, this time to the international manager of SBOI in New Delhi. On April 29, 1992, SBOI confirmed that the December 1991 credit was a mistake, but refused to give any explanation. SBOI also informed Norwest that its account was overdrawn by 276,000 rupees.

21. Norwest later learned that transferring non-convertible rupees into accounts owned by firms and banks outside of India and Russia is forbidden by the Foreign Exchange Regulations of India and the Soviet–Indian Trade and Payment Agreement. Stipakov does not dispute this fact.

22. Norwest debited Stipakov's account for $231,929.12 on April 30, 1992, and for $2,293 in interest thereon on May 12, 1992.

23. Impulse then filed this action, alleging claims against the Bank of Russia, SBOI, and Norwest. Impulse did not name Petrospek as a defendant, apparently for "business reasons."

24. Subsequently, SBOI was dismissed from the case for lack of jurisdiction. The Bank of Russia has never made an appearance in this action. Impulse's remaining claims are all against Norwest.

## CONCLUSIONS OF LAW

### I. *Introduction*

1. Impulse asserts claims against Norwest for: (1) violation of Article 4A of the Uniform Commercial Code ("U.C.C."), Minn. Stat. §§ 336.4A–101 *et seq.;* (2) wrongful set-off; (3) conversion; and (4) negligence. The Court will address each claim in turn.

### II. *Article 4A of the U.C.C. Preempts All of Impulse's State Law Claims As They Relate to the Funds Transfer*

1. This action is governed by Article 4A of the U.C.C. which covers electronic funds transfers. *Impulse Trading v. Norwest Bank Minnesota, N.A.,* 870 F.Supp. 954, 959 (D.Minn.1994). Minnesota adopted Article 4A of the U.C.C. in 1991. M.S.A. § 336.4A–101 *et seq.*

2. The comment to Article 4A states the following:

In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment....

The rules that emerged represent a careful and delicate balancing of [various] inter-

ests and are intended to be the *exclusive* means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, *resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.* (emphasis added).

3. In the only case the Court has located specifically addressing the scope of Article 4A's preemption, the court found common law tort claims to be preempted by Article 4A. *See Donmar Enterprises, Inc. v. Southern Nat'l Bank of North Carolina,* 828 F.Supp. 1230, 1235–36 (W.D.N.C.1993) (finding that Federal Reserve Board Regulation J which adopts Article 4A of the U.C.C. preempts both contradictory and duplicative causes of action for wrongful payment and negligence), *aff'd,* 64 F.3d 944 (4th Cir.1995). Preemption is also in accord with the Minnesota courts' general interpretation of the U.C.C. as barring all common law tort claims arising out of commercial transactions except those involving personal injury. *See Hapka v. Paquin Farms,* 458 N.W.2d 683, 688 (Minn.1990) (finding that in cases involving commercial transactions the U.C.C. preempts tort claims for strict products liability and negligence); *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159, 162 (Minn. 1981) ("To allow tort liability in commercial transactions would totally emasculate ... the U.C.C. Clearly the legislature did not intend for tort law to circumvent the statutory scheme of the U.C.C.")

■ 4. Therefore, Article 4A preempts Impulse's common law claims for conversion, wrongful setoff and negligence as they relate to the funds transfer.

## III. *Norwest Is Not Liable to Impulse Under Article 4A*

### A. *The Payment Order Was Cancelled by Operation of Law*

1. If a receiving bank does not execute a payment order within five business days, the payment order is cancelled by operation of law. Minn.Stat. § 336.4A–211(d). This rule was designed to prevent unexpected delayed acceptances of payment orders. *See* Minn. Stat. § 336.4A–211, Comment 6.

2. A receiving bank accepts a payment order when it executes the order. Minn.Stat. § 336.4A–208(a). A payment order is executed when the receiving bank issues a payment order intended to carry out the payment order received by the bank. Minn.Stat. § 336.4A–301(a).

3. A cancelled payment order cannot be accepted. Minn.Stat. § 336.4A–211(d).

4. Here, SBOI received a payment order from the Bank of Russia on November 21, 1991, but did not execute the order until December 19, 1991. As a result of this delay, the payment order was cancelled by operation of law, and Norwest could not have accepted it.

### B. *SBOI Was Forbidden By Law From Accepting the Payment Order From the Bank of Russia*

1. A receiving bank cannot accept a payment order that it is forbidden by law to receive. Minn.Stat. § 336.4A–209(c).

2. Here, both the Foreign Exchange Regulations of India and the Soviet–Indian Trade and Payment Agreement prohibit the transfer of non-convertible rupees to accounts held by firms and banks outside of Russia and India. Thus, SBOI was forbidden by law to transfer non-convertible rupees into Norwest's SBOI account, and SBOI's attempted acceptance of the payment order from the Bank of Russia was ineffective.

### C. *Because Norwest Never Received or Accepted a Legitimate Payment Order From SBOI Directing It to Pay Impulse, Norwest is Not Liable to Impulse*

1. Except under circumstances not applicable in this case, a beneficiary's bank receiving an electronic funds transfer is not liable to the beneficiary for those funds unless the beneficiary's bank has received and accepted a payment order. *See* Minn.Stat. § 336.4A–212 & § 336.4A–209(c); *see also,* Minn.Stat. § 336.4A–209(b)(3) & § 336.4A–210(b) (stating exceptions to this rule).

■ 2. As discussed above, the payment order Norwest received from SBOI was inef-

fective because it had been cancelled by operation of law and because SBOI was forbidden by Indian law from accepting it. Therefore, Norwest is not liable to Impulse for payment, and Norwest was entitled to set off Impulse's account in the amount of the credit plus interest.

IV. *Impulse's Negligence Claim Against Norwest for Advising Impulse to Pursue a Course of Dealing Without Proper Investigation Is Unavailing*

1. The only claim Impulse makes against Norwest that is not preempted by Article 4A is the assertion that Norwest was negligent in advising Impulse to conduct the rupee/dollar exchange without first properly investigating the legality of such an arrangement. This claim is not preempted because it does not relate directly to the funds transfer itself.

2. When granting summary judgment for Norwest on Impulse's breach of fiduciary duty claim, Judge Doty observed that under Minnesota law the relationship between a bank and a customer is that of creditor/debtor. *Impulse Trading*, 870 F.Supp. at 961; This relationship does not give rise to any fiduciary duty unless there is a special relationship. *Id.; see also, Hurley v. TCF Banking and Savings, F.A.*, 414 N.W.2d 584, 587 (Minn.Ct.App.1987); *Stenberg v. Northwestern Nat'l Bank of Rochester*, 238 N.W.2d 218, 219 (Minn.1976). A special relationship arises only where the bank "knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank … to counsel and inform him". *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W.2d 619, 623 (Minn.1972).

3. Here, Impulse has not demonstrated that there was any special relationship between Impulse and Norwest that would give rise to a duty leading to negligence liability. For the following reasons, Norwest had no reason to believe that Stipakov was relying on its foreign exchange department for advice on the legality of exchanging non-convertible rupees for dollars.

4. First, the relationship between Norwest and Stipakov was no more than that of bank and bank customer. Norwest never gave Stipakov any advice concerning the legality of exchanging non-convertible rupees for dollars, knew next to nothing about Stipakov's business affairs, played no role in negotiating the logistics of Impulse's contracts, and had little or no contact with Impulse's customers in the Soviet Union.

5. Second, Norwest did not possess any superior or expert knowledge about international foreign exchange laws that would lead to a duty to advise Stipakov of problems with exchanging his rupees. Grubbe testified that when she recommended the rupee exchange arrangement to Stipakov, she knew nothing about Russian or Indian currency exchange laws and was not even aware that the rupees Stipakov wished to exchange had originated in Russia. To require Norwest to investigate the circumstances of all foreign transactions arranged by its customers, as well as the source of all currency it exchanges, would be unreasonable. *See Hurley*, 414 N.W.2d at 588 (commenting that "[t]o hold [the bank] liable for failing to discover tax consequences would be unreasonable. [The bank] would have to exhaustively explore the financial affairs of each mortgage customer.")

6. Lastly, Stipakov was experienced in international business transactions and had arranged deals with Soviet companies on previous occasions. He also spent the first 26 years of his life in the Soviet Union, and was aware of the legal difficulties involved in converting rubles to foreign currencies. *See Stenberg*, 238 N.W.2d at 219 (finding that no special relationship existed because the plaintiff was "a businessman with some years of experience, capable of independent judgment which he was capable of exercising and did exercise.")

7. In sum, there was no special relationship between Impulse and Norwest that could render Norwest liable for negligence.

## CONCLUSION

In light of the foregoing, the Court finds in favor of Norwest on all claims in this action. Let judgment be entered accordingly. The parties shall bear their own costs.

IT IS SO ORDERED.