**MOODY NATIONAL BANK, Appellant,**

v.

**TEXAS CITY DEVELOPMENT LTD., CO., Appellee.**

**No. 01–00–00052–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

April 12, 2001.

Michael G. Adams, Michael David Leblanc, Steven Carl Windsor, Andrew J. Mytelka, Kenneth J. Bower, Galveston, for Appellant.

Russell G. Burwell, Texas City, Daryl L. Moore, JoAnn Storey, Houston, for Appellee.

Panel consists of Justices COHEN, JENNINGS, and DUGGAN.*

## OPINION

JENNINGS, Justice.

Appellant, Moody National Bank, challenges a damages award based on the jury's finding that the bank was negligent when it erroneously informed the parties it had not received a wire transfer of funds. We are asked to determine whether this funds transfer gone awry fell within the scope of Article 4A of the Texas Business and Commerce Code,[1] thus preempting a common law negligence claim. We conclude that it does, and we reverse.

Appellee/cross-appellant Texas City Development Ltd., Co. (TCD) contends the trial court erred in rendering a directed verdict on its Deceptive Trade Practices Act[2] (DTPA) claim. We affirm the directed verdict.

## Facts

The parties do not disagree about the essential facts underlying this dispute. The owners of an out-of-business Holiday Inn donated the property to Texas City. A city agency sought proposals from various sources to develop the property. Xenos Yuen formed TCD to acquire title to the property, intending to open an amusement park on the premises. Yuen knew the city agency's representative, Douglas Hoover, from previous business dealings, and submitted his proposal to Hoover. Of the various proposals it received, the city found Yuen's the most appealing; in the summer of 1995, it passed a resolution authorizing Hoover to negotiate with TCD regarding the sale of the property. Although they negotiated for several months, TCD and Hoover never developed a contract for sale.

Originally, the city had intended to give away the property, not sell it. However, after it spent $156,108.10 to remove asbestos from the building, it decided to sell it for that amount. TCD sought investors to help it acquire title and develop the property. Sinotrans, a Hong Kong company owned by Yuen and his brother, agreed to provide the money to buy the property in exchange for a 25% ownership share of TCD. Hopu, a Taiwanese company experienced in building amusement parks, agreed to invest $2.3 million in the project in exchange for a 75% ownership share of TCD.

In November 1995, Hoover asked TCD to demonstrate its seriousness and good faith by depositing the purchase price in a Stewart Title Co. escrow account at Moody Bank. Yuen arranged for the Bank of East

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. Tex. Bus. & Com.Code Ann. § 4A (Vernon 1994).

2. Tex. Bus. & Com.Code Ann. § 17.46 (Vernon 1994).

Asia to wire transfer $156,108.10 to Stewart Title's account at the bank. The transfer order was received, and the money credited to Stewart Title's account on December 4, 1995. Both Stewart Title and Yuen, however, were erroneously informed that the wire transfer had not been received.

Over the next couple of days, Yuen and Don Lera, a Stewart Title representative, made numerous calls to the bank about whether the funds had been transferred. Sandra Messinger, the bank's wire transfer clerk, repeatedly told Lera that the bank did not have the funds and did not know where they were. Each time he called, Lera asked Messinger to look for a transfer amount of $150,000 or $151,000. When Yuen was on the line, he told Messinger the money was important and that a land deal would fall through if it were not located. Messinger testified she did not mention the wire transfer to Stewart Title for $156,108.10 when Yuen was also on the phone, because that information was confidential. Yuen, however, contends he mentioned that precise amount. Messinger did not pull up Stewart Title's account history, or look for all wire transfers the bank received on December 4. Had she done so, she would have seen that only one wire transfer came in, it was for $156,108.10, and it was deposited into Stewart Title's account. Lera did not ask to speak to Messinger's supervisor. Although Messinger suggested that Yuen initiate a trace of the transfer, he never did so.

When Yuen attempted to buy the property on December 6, Hoover refused to close the deal because Stewart Title told Hoover it had not received the money. The minutes of the council meeting that followed on the heels of Hoover's meeting with Yuen shows that Hoover thought this turn of events might be best for the city.

Hoover noted Yuen was continuing to press points Hoover thought had been finally settled. Yuen discovered a month later that the money had been in Stewart Title's account all along, and tried again to buy the property; by then, the city had made other arrangements and it was too late.

TCD sued Moody Bank and Stewart Title for negligence, gross negligence, breach of contract, DTPA violations, and breach of fiduciary duty. Before trying the case to a jury, the trial court directed a verdict in favor of the bank and the title company on all causes of action except negligence against both, and breach of fiduciary duty against Stewart Title. The court denied Moody's motion for directed verdict based on Article 4A preemption. The jury found that both the bank and the title company were negligent, apportioned fault at 45% and 55% respectively, and found that the title company breached its fiduciary duty to TCD. The trial court denied the bank's motions for judgment notwithstanding the verdict and new trial.

TCD and Stewart Title settled before appeal. Moody now appeals the award of $302,981.44 in damages against it based on negligence. On appeal, it argues the negligence claim was preempted by Article 4A of the Texas Business and Commerce Code, it owed no duty to TCD, and "capital investments lost" is not a proper measure of damages.

## The Scope of Article 4A

In its first issue presented for review, Moody contends TCD's negligence claim was preempted by Article 4A. Funds transfers are governed by Article 4A, which Texas adopted from the Uniform Commercial Code in 1993. Section 4A.104 defines a "funds transfer" as

> [T]he series of transactions, beginning with the originator's payment order,

made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

TEX. BUS. & COM.CODE ANN. § 4A.104(1) (Vernon 1994). The funds transfer here was completed when Moody Bank received payment of the entire amount of the order. *See id.* at § 4A.209(b) (Vernon 1994).

▇▇▇ When we construe a statute, we must give effect to the legislature's intent. *See* TEX. GOV'T CODE §§ 311.021, 311.023, & 312.005 (Vernon 1998); *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000). We ascertain the legislature's intent based on the plain and common meaning of the words used. *See* TEX. GOV'T CODE § 311.011 (Vernon 1998); *Kroger,* 23 S.W.3d at 349. We may also consider, among other things, the circumstances under which a statute was enacted, former statutory provisions, including laws on the same or similar subjects, and the consequences of a particular construction. *See* TEX. GOV'T CODE § 311.023; *Kroger,* 23 S.W.3d at 349.

No Texas case addresses the scope of Article 4A. Relying on virtually the same federal cases, both parties note that Article 4A has never been interpreted to preempt *all* common law claims; it is intended only to bar those claims that would be inconsistent with any of the article's provisions. TEX. BUS. & COM.CODE ANN. § 4A.102, UCC cmt. (Vernon 1994); *see also Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 905 F.Supp. 127, 131

(S.D.N.Y.1995); *Impulse Trading, Inc. v. Norwest Bank Minnesota, N.A.,* 907 F.Supp. 1284, 1289 (D.Minn.1995); *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2nd Cir.1998).

The bank argues that TCD's complaint falls squarely within the parameters of Article 4A, thus its claim for negligence is preempted. TCD contends article 4A does not apply and therefore the claim is not preempted because (1) the bank's negligence occurred *after* the funds transfer was complete; (2) TCD had no relationship to the funds transfer—*i.e.,* it was neither an originator nor a beneficiary of the funds transfer; and (3) Article 4A does not specifically address the subject matter of TCD's complaint.

*Timing*

▇▇▇ We cannot agree that the acts complained of were not preempted merely because they occurred after acceptance of the funds. Section 4A.404(b) requires a bank to follow instructions to notify the beneficiary[3] when it accepts a payment order, and provides a remedy if the bank does not do so. TEX. BUS. & COM.CODE ANN. § 4A.404(b) (Vernon 1994). A beneficiary may also recover consequential damages if the bank had notice of such damages and wrongfully refused to pay after demand. *Id.* at § 4A.404(a) (Vernon 1994). These provisions necessarily contemplate that a bank may be liable for acts that occur after funds are received, specifically, for failing to notify the beneficiary, as occurred here. Moreover, the authority TCD cites for the proposition that its common law remedy for the bank's conduct is not preempted because it happened after acceptance of the funds does not so hold. It was not the timing of the conduct that

---

**3.** The "beneficiary" of the transfer was Stewart Title, not TCD. Section 4A.103(2) provides: " 'Beneficiary' means the person to be paid by the beneficiary's Bank." Moody was the beneficiary's bank.

was at issue in either case; rather, it was whether the complained-of conduct bore any relationship to the funds transfer. *See Centre–Point,* 913 F.Supp. 202, 207–08 (holding advice regarding rollover account unrelated to funds transfer); *Impulse Trading,* 907 F.Supp. at 1289 (holding advice regarding rupee/dollar exchange unrelated to funds transfer); *Sheerbonnet,* 905 F.Supp. at 136 (concluding bank engaged in self-dealing to appropriate funds to pay debt owed by insolvent transferee bank). Here, the conduct complained of was clearly related to the funds transfer.

*TCD's Relationship to the Funds Transfer*

After listing the parties to the transaction and their respective roles, TCD argues it was outside the scope of Article 4A as a matter of law because it had no relationship to the funds transfer. It bases this argument on what it contends the bank argued on appeal, that Yuen was the "sender" or "originator" of the wire transfer. What the bank actually argued was that "Xenos Yuen or one of the corporations he was associated with" was the sender or originator. Moreover, although TCD again relies on *Centre–Point* and *Impulse Trading* to support its argument that it was not a party to the transaction, neither case addresses this issue. By exercising jurisdiction over this case, it is evident the trial court made an implied finding of fact that Yuen was acting on behalf of TCD when he originated the funds transfer. Thus, TCD was a sender whose rights and remedies are governed by Article 4A.

*Subject Matter of TCD's Complaint*

■ Finally, we must decide whether the subject matter of TCD's complaint is addressed with sufficient specificity in Article 4A to preclude a negligence claim. The facts in this case do not readily identify it as one in which the complaint is clearly outside the scope of Article 4A, as is true in *Centre–Point,* 913 F.Supp. at 207–08 (holding advice regarding rollover account unrelated to funds transfer) and in *Impulse Trading,* 907 F.Supp. at 1289 (holding advice regarding rupee/dollar exchange unrelated to funds transfer). Nor do the facts readily identify the case as one unquestionably addressed by a particular provision of Article 4A. *See Aleo Int'l, Ltd. v. Citibank, N.A.,* 160 Misc.2d 950, 612 N.Y.S.2d 540, 541 (N.Y.Sup.Ct.1994) (showing provision of statute was directly on point); *Corfan Banco Asuncion Paraguay v. Ocean Bank,* 715 So.2d 967, 970 (Fla.Ct.App.1998) (applying "clear and unambiguous terms" of statute to complaint); *cf. Sheerbonnet,* 905 F.Supp. at 136 (concluding that because none of Article 4 A's provisions directly addressed claim for conversion, claim not preempted).

■ Common law claims are precluded when a claim would impose liability inconsistent with any of the Article's provisions. *Grain Traders, Inc.,* 160 F.3d at 103. The official commentary provides in regard to the drafting of Article 4A:

Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. **The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights,**

duties and liabilities inconsistent with those stated in the Article.

TEX. BUS. & COM.CODE ANN. § 4A.102, UCC cmt. (emphasis added). The bank characterizes the mistake as a notification issue, and we agree.

When we apply the rules of statutory construction, and consider the purposes for which Article 4A was drafted, we conclude it applies here even though the precise nature of the mistake the bank made here is not specifically set out in the statute. Whatever the reason for the mistake—funds not received at all, funds lost, funds credited to the wrong account, or, as here, funds erroneously reported as not received—the outcome would have been the same: Stewart Title would have told Hoover the funds were not received, and the deal would have fallen through. We conclude that this is the sort of circumstance the notification portion of the statute was intended to address; as such, it is governed by Article 4A. *See* TEX. BUS. & COM. CODE ANN. § 4A.404(b).

Misinforming the parties was tantamount to failing to send proper notice. A bank's duty to notify a beneficiary when it deposits a funds transfer is set out as follows:

> If a payment order accepted by the beneficiary's bank instructs payment to an account of the beneficiary, *the bank is obliged to notify the beneficiary of receipt* of the order before midnight of the next funds transfer business day following the payment date.

*Id.* (emphasis added). In addition, the remedy is set out in this section. If the bank does not properly notify a beneficiary of a payment order it has accepted, it must pay interest to the beneficiary on the amount of the payment order from the day notice should have been given until the day the beneficiary learned of receipt of the payment order by the bank. *Id.*

We hold that TCD was limited to the remedies in Article 4A, and was not entitled to recover under a common law negligence claim.

We sustain Moody's first issue. Accordingly, we need not address the bank's contention that it owed TCD no duty, or its arguments regarding whether "capital investments lost" is a proper measure of damages.

### DTPA Claim

As cross-appellant, TCD contends the trial court erred in granting an instructed verdict on its DTPA claim. It argues the misinformation Messinger conveyed constituted a representation that she had acted as a reasonable and prudent bank clerk, falsely representing that her services had characteristics or benefits they did not have or that the services were of a particular quality or grade when they were of another. *See* TEX. BUS. & COM.CODE ANN. § 17.46(5) (Vernon 1994). Generally, when we review the granting of an instructed verdict, we determine whether there is probative evidence raising a fact issue on the question presented. *See Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). Here, however, we conclude as a matter of law that TCD was not a consumer within the meaning of the Deceptive Trade Practices Act. Under the DTPA, a consumer is one who seeks or acquires, by purchase or lease, any goods or services. TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1994); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981); *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.* 994 S.W.2d 830, 838 (Tex. App.—Houston [1st Dist.] 1999, no pet.). The goods or services sought or acquired must form the basis of the complaint. *Cameron,* 618 S.W.2d at 539; *Flameout,* 994 S.W.2d at 838. There is no evidence

to suggest TCD was attempting to buy or lease any goods or services from the bank; therefore, it cannot qualify as a consumer. We hold the trial court did not err in granting the instructed verdict.

We affirm the directed verdict on the DTPA claim.

We reverse the judgment on the negligence claim and remand the cause.