Opinion issued February 5, 2015



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-01000-CV

————————————

**CONTRACTORS SOURCE, INC., Appellant**

**V.**

**AMEGY BANK NATIONAL ASSOCIATION
D/B/A AMEGY BANK OF TEXAS, Appellee**

---

**On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 2012-53936**

---

## O P I N I O N

Amegy Bank of Texas obtained a summary judgment dismissing Contractors Source, Inc.'s claims of breach of contract, breach of express warranty, conversion, and negligent misrepresentation. Contractors Source appeals from the ruling, which included an award of attorney's fees. Finding no error, we affirm.

## Background

Contractors Source purchases geosynthetic construction materials at a cost of approximately $5 million per year, which it then resells to the construction industry. The co-owners and sole officers of Contractors Source are Merri Brecher, its president, and her husband, Gary Brecher, its vice president.

The Brechers met with representatives of Amegy to investigate opening a bank account for Contractors Source. The Brechers and Amegy's representatives discussed the bank's offerings. According to Merri Brecher, Amegy represented that it employed state-of-the-art security systems, operations, and protocols to protect funds on deposit. In February 2006, Contractors Source opened an account with Amegy, with the Brechers authorized as the only signatories. Amegy sent Contractors Source a monthly statement of its account, which arrived on or about the twelfth day of the month following the month covered by the statement.

In July 2007, Contractors Source hired Maria Straten, also known as Maria Henry, as its in-house bookkeeper. By January 2008, Straten began misappropriating money in Contractors Source's Amegy account, primarily to pay her personal creditors. Straten's primary method was to obtain the funds through third-party websites by using the routing and checking account number for the account. According to Contractors Source, from January 2008 through at least September 2010, Straten misappropriated at least $844,358.80. Her activities

2

culminated in a pair of forged checks on which Straten signed Merri Brecher's name in September 2010. The first such check was payable to the home-improvement store Lowe's for $17,875.43, and the second was payable to "Maria Henry" for $2,000.00.

Contractors Source did not discover Straten's unauthorized activities until November 7, 2010, when Merri Brecher reviewed the September 2010 Amegy statement, which listed the forged checks. On that same day, she notified Amegy that the Lowe's check was unauthorized. The next day she executed and delivered to Amegy an "Affidavit of Forgery, Endorsement or Alteration" regarding the $2,000 check to Maria Henry. On November 10, she did the same regarding the Lowe's check. Amegy determined that the signature on the Maria Henry check did not match the signature on file and credited $2,000 to Contractors Source's account. Amegy did not reimburse Contractors Source for any other funds misappropriated by Straten.

At all relevant times, Amegy imposed various rules and regulations on Contractors Source's account. As pertinent to this case, Amegy specified that Contractors Source had at most 30 days to report unauthorized signatures, alterations, or forgeries in its account, and at most 60 days to report errors in its account statements other than unauthorized signatures, alterations, or forgeries, such as encoding errors.

3

Contractors Source sued Amegy for $975,000 plus attorney's fees on theories of breach of contract, breach of warranty, and negligence. In the course of litigation it moved to compel discovery of various Amegy schedules of fees, disclosures, rules, regulations, and other documents, which the trial court denied.

Amegy moved for traditional and no-evidence summary judgment. The trial court granted summary judgment to Amegy, without specifying its reasons for doing so.

## Analysis

Contractors Source appeals, arguing that the trial court erred by (1) granting summary judgment as to the Lowe's check; (2) granting summary judgment as to automated clearing house transactions; (3) granting summary judgment as to common-law claims; and (4) denying a motion to compel discovery.

### I.   Summary judgment

Both traditional and no-evidence summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005) (traditional); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156–57 (Tex. 2004) (no-evidence). "A no-evidence summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003).

To prevail on either type of summary-judgment motion, the movant has the burden of showing that no genuine issue of material fact exists and that it is therefore entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co. Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant moving for summary judgment is required either to negate conclusively at least one essential element of the plaintiff's cause of action or to establish conclusively each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). To determine whether there is a disputed issue as to a material fact, we consider evidence favorable to the nonmovant as true and draw every reasonable inference in its favor, resolving all doubts in favor of the nonmovant. *Nixon*, 690 S.W.2d at 548–49.

When, as in this case, the trial court's order granting summary judgment does not specify its grounds, "we may affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005). We will only consider as grounds for reversal issues that were "expressly presented to the trial court by written motion, answer or other response." TEX. R. CIV. P. 166a(c).

An affidavit supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters

stated therein." TEX. R. CIV. P. 166a(f). An affiant's belief about the facts is legally insufficient evidence. *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). Likewise, conclusory affidavits do not raise fact issues because "[t]hey are not credible, nor susceptible to being readily controverted." *Ryland Grp.*, 924 S.W.2d at 122; *see Brownlee*, 665 S.W.2d at 112. "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no writ).

Under Texas law, the Uniform Commercial Code regulates a bank's relationship with its Texas customers, as well as its handling of funds transfers. *See generally* TEX. BUS. & COM. CODE §§ 3.101–.605 (negotiable instruments); *id.* §§ 4.101–.504 (bank deposits and collections), *id.* §§ 4A.101–.507 (funds transfers); *Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 683 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (observing that the UCC creates "a discrete fault scheme, specifically allocating responsibility among parties to a banking relationship"). The relationship may also be governed in part by agreements between the bank and its customer, such as an agreement governing the processing of negotiable instruments presented to the bank. *E.g.*, *Bank of Tex.*, 276 S.W.3d at 677.

## A.    Lowe's check and the "repeat wrongdoer" rule

In its first issue, Contractors Source argues that it was entitled to recredit of the check to Lowe's as a matter of law. Alternatively, it argues that it raised questions of material fact regarding whether Amegy exercised good faith in paying the Lowe's check, thus precluding an adverse summary judgment. Among other things, Amegy responds that Contractors Source's failure to exercise ordinary care and the Section 4.406 "repeat wrongdoer" rule each bar recovery. When a bank provides periodic statements of an account, the banking customer is required to examine the statements and report any unauthorized transactions promptly. TEX. BUS. & COM. CODE § 4.406(c). If the bank proves that the customer has failed to do so, the customer is precluded from asserting against the bank:

> the customer's unauthorized signature or alteration by the same wrongdoer on any other item *paid in good faith by the bank* if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

*Id.* § 4.406(d)(2) (emphasis supplied). But if the bank failed to exercise "ordinary care" in paying an item and that failure contributed to a loss, then the loss must be allocated between the bank and the customer in proportion to their contributions to the loss. *Id.* § 4.406(e). Even if the bank failed to exercise care, however, the customer must report its loss within one year after a statement of the item in

7

question is made available to the customer; after that time, the customer may not claim a loss for that item against the bank. *Id.* § 4.406(f). The applicability of Section 4.406 is a question of law which we review de novo. *Am. Airlines Emp.'s Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).

The undisputed evidence shows that Straten began making unauthorized payments using the Contractors Source account by early 2008, more than two years before any unauthorized transactions were first reported to Amegy. The parties also agree that Amegy delivered monthly statements to Contractors Source showing the unauthorized transactions, arriving the month after the transactions listed occurred. Thus, Amegy has demonstrated that it sent statements, that those statements reflected unauthorized transactions by Straten, and that Contractors Source failed to notify Amegy of any unauthorized transactions within 30 days. Amegy has thus satisfied the requirements of the UCC. *See* TEX. BUS. & COM. CODE § 4.406(a), (c), (d)(2). After Amegy has made this showing, Contractors Source may not recover for "*any other item* paid in good faith by the bank" due to Straten's acts. *Id.* § 4.406(d)(2) (emphasis supplied).

### 1.    *"Items" vs. "payment orders"*

The parties dispute whether the non-check transactions by Straten were "items" that triggered the application of Section 4.406 and the repeat wrongdoer rule as argued by Amegy. Contractors Source argues that, instead, the transactions

were "payment orders" governed by Chapter 4A, which lacks a similar repeat-wrongdoer provision.

The UCC defines several types of banking transactions. An "item" is "an instrument or a promise or order to pay money handled by a bank for collection or payment." *Id.* § 4.104(a)(9). An "item" does not include "a payment order governed by Chapter 4A or a credit or debit card slip." *Id.* Relatedly, a "remotely-created item" is:

> an item that is created by a third party, other than the payor bank, under the purported authority of the drawer of the item for the purpose of charging the drawer's account with a bank and that does not bear a handwritten signature purporting to be the signature of the drawer.

*Id.* § 3.103(a)(16) (defining term); *see also id.* § 4.104(c) (Chapter 3's definition of "remotely-created item" applies to Chapter 4).

A "payment order" is defined under Chapter 4A as:

> . . . an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
>
> (A)  the instruction does not state a condition of payment to the beneficiary other than the time of payment;
>
> (B)  the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender; and
>
> (C)  the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds transfer system, or communication system for transmittal to the receiving bank.

*Id.* § 4A.103(a)(1).

Applying these definitions, the non-check transactions at issue were not payment orders. Straten did not transmit her instructions directly to the receiving bank or an agent, funds transfer system, or communication system for transmittal to Amegy. *Id.* § 4A.103(a)(1)(C). Rather, she submitted them to third parties, which then submitted instructions to Amegy.

These transactions more closely fit the definition of a remotely-created item under Section 3.103(a)(16) in that the instructions to Amegy came from third parties, under the purported authority of Contractors Source, for the purpose of charging Contractors Source's account, and they did not bear a signature. *Id.* § 3.103(a)(16). The term "item" is to be read broadly under Texas law. *Am. Airlines Emps.*, 29 S.W.3d at 92–93. We hold that Straten's non-check transactions were not payment orders, but instead were items within the meaning of Chapter 4 and thus not excluded from the scope of Section 4.406(d)(2) on that basis.

### 2. *Bank's good faith*

Contractors Source also argues that it has raised a question of material fact as to whether the bank acted in good faith by paying the Lowe's check, which is a prerequisite to the application of the repeat wrongdoer rule. TEX. BUS. & COM. CODE § 4.406(d)(2). For purposes of the UCC, "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* § 1.201(b)(20). It is well-settled in Texas that "[t]he law presumes, in the absence

of proof to the contrary, that the business transactions of every man are done in good faith, and for an honest purpose; and any one who alleges that such acts are done in bad faith, or for a dishonest and fraudulent purpose, takes upon himself the business of showing the same." *Compton, Ault & Co. v. Marshall*, 29 S.W. 1059, 1059 (Tex. 1895); *see also Canfield v. Bank One, Tex., N.A.*, 51 S.W.3d 828, 837 (Tex. App.—Texarkana 2001, pet. denied). "The test for good faith is the actual belief of the party in question, not the reasonableness of that belief." *La Sara Grain Co. v. First Nat'l Bank of Mercedes, Tex.*, 673 S.W.2d 558, 563 (Tex. 1984); *Canfield*, 51 S.W.3d at 837.

As evidence of Amegy's alleged failure to act in good faith, Contractors Source first points to an alteration to the front of the Lowe's check: Straten wrote her home telephone number in pen above Contractors Source's printed name and address. According to Contractors Source, this raises a fact issue whether the bank acted in good faith by honoring the check. While the copy of the check in the record does bear a phone number above the printed information, it also bears many other unidentified markings in the same general area, which Contractors Source does not allege to be indicators that the check was unauthorized or that Merri Brecher's signature was forged. We cannot tell from the record who added these markings—Contractors Source, Straten, Lowe's, Amegy, or someone else—much

11

less why the presence of a handwritten phone number would be likely to alert Amegy to the fact that the check was a forgery.

Moreover, Contractors Source does not articulate any argument as to why the presence of the handwritten phone number raises any question of fact regarding Amegy's good faith, ordinary care, or any other issue. It does not identify—and we cannot find—any legal authority for the proposition that stray markings on a check, even alterations of the depositor's contact information, are indicators of forgery or an unauthorized check. Nor does Contractors Source provide any authority for the proposition that somehow Amegy should have recognized the phone number as belonging to Straten. Accordingly, we reject Contractors Source's contention that the presence of Straten's phone number on the Lowe's check raised any question of material fact as to whether Amegy acted in good faith in honoring that check.

Contractors Source also contends, without explanation, that Amegy's decision to recredit the $2,000 Maria Henry check is some evidence that it acted without good faith in honoring the Lowe's check. Merri Brecher contends in her affidavit testimony that the signature on the Lowe's check is "clearly a forgery and appears to me to be traced." But the test for good faith is whether Amegy's employees held a belief that the signature was legitimate when they processed it, not whether that belief was reasonable. *La Sara Grain*, 673 S.W.2d at 563; *Canfield*, 51 S.W.3d at 837. Amegy introduced as summary-judgment evidence an

affidavit of Laura Poshard, an Amegy vice president, that Amegy's employees reviewed both checks and, while the signature on the $2,000 check did not match Merri Brecher's signature, the signature on the Lowe's check did.

Contractors Source does not identify any other evidence that would tend to show that Amegy did not act in good faith. We hold that Amegy has demonstrated that the Lowe's check was paid in good faith, satisfying the requirements of Section 4.406(d)(2).

### 3. *Bank's ordinary care*

Contractors Source also argues that it raised a question of fact as to whether Amegy exercised ordinary care in paying the Lowe's check, as required by Section 4.406(e). *See* TEX. BUS. & COM. CODE § 4.406(e). The UCC defines "ordinary care" as follows:

> "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or Chapter 4.

*Id.* § 3.103(a)(9); *see also id.* § 4.104(c) (Chapter 3's definition of "ordinary care" applies to Chapter 4).

As support for its argument, Contractors Source's response to the motion for summary judgment referred to nearly all of its attached evidence, some 168 pages of documents consisting mostly of "Collection Entry Reports" detailing individual transactions produced by Amegy. The response failed to explain the significance of any particular document or facts contained therein. Moreover, the response did not provide citations to any legal authority regarding a bank's duty of ordinary care. Contractors Source's appellate brief displays the same defects.

We interpret Contractors Source's arguments as relying on the affidavits of Don Coker and John Fricke, who apparently, but not explicitly, were offered as expert witnesses on banking practices. The Coker and Fricke affidavits are verbatim duplicates, with the exception of the affiants' names and work histories, even including the same grammatical errors. In each one, the affiant opines as to what constitutes ordinary care and good faith in the banking industry, concluding that Amegy did not follow best practices and therefore did not act with ordinary care or in good faith. What the affidavits lack, however, is any recitation of facts demonstrating that Amegy did not follow such practices. That is, the affidavits demonstrate an absence of personal knowledge of the facts of this case. *See* TEX. R. CIV. P. 166a(f). They instead recite in conclusory fashion the affiants' beliefs regarding the facts, and thus are no evidence of a question of fact regarding

Amegy's exercise of reasonable care. *Ryland Grp.*, 924 S.W.2d at 122; *see Brownlee*, 665 S.W.2d at 112; *Rizkallah*, 952 S.W.2d at 587.

Both the Coker and Fricke affidavits, as well as Merri Brecher's affidavit, identify the Collection Entry Reports as evidence that Amegy acted without ordinary care. Many of the reports contain the name "Maria Straten" or "Maria Henry," but Contractors Source identifies no evidence as to the significance of those names on the reports. There also is no evidence in the record that those Collection Entry Reports indicate a lack of ordinary care with respect to the Lowe's check.

Section 3.103's definition of ordinary care provides that a bank is not required to examine an instrument "if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage." TEX. BUS. & COM. CODE § 3.103(a)(9). We hold that Contractors Source has failed to raise a fact issue regarding Amegy's exercise of ordinary care. Amegy was therefore entitled to summary judgment regarding the Lowe's check under the protections afforded by Section 4.406 of the Business and Commerce Code, and we overrule Contractors Source's first issue.

## B. Unauthorized automated clearing house transactions

In its second issue, Contractors Source argues that Amegy was not entitled to summary judgment regarding the various payments submitted by Straten

15

through third-party bill-payment websites, which it characterizes as automated clearing house transactions. Specifically, it argues that it raised a fact issue regarding whether Amegy established various defenses under Chapter 4A of the Business and Commerce Code, which governs funds transfers. Contractors Source concedes that Section 4A.505 of the Business and Commerce Code precludes it from asserting claims based on unauthorized transactions that Straten made more than one year before Contractors Source first reported any unauthorized activity to Amegy. Thus, only the transactions after November 7, 2009 are at issue in this appeal.

Amegy argues that these claims are barred by the repeat-wrongdoer rule and that Contractors Source did not produce evidence that it ever notified the bank of any specific transactions that were unauthorized other than the two forged checks. We agree. For the reasons discussed above, the repeat wrongdoer rule of Section 4.406(d)(2) bars recovery on these transactions because Contractors Source failed to report the initial unauthorized transactions by Straten and has not raised a fact issue regarding Amegy's good faith or ordinary care. Amegy therefore was entitled to summary judgment as to Straten's non-check transactions, and we need not address Contractors Source's issues raised concerning Amegy's other defenses.

## C. Common-law claims

In its third issue, Contractors Source argues that summary judgment was improper on its claims for breach of contract, breach of warranty, and negligence. Amegy responds that the UCC displaces these common-law remedies and thus bars recovery by Contractors Source. We agree.

Contractors Source's claims for breach of contract and negligence arise from the common law. Breach of contract is a common-law remedy unless the contract is for the sale or lease of goods, situations not applicable to this case. *Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.); *see also* TEX. BUS. & COM. CODE §§ 2.102, 2A.102. Similarly, negligence is a common-law doctrine. *See*, *e.g.*, *Rocha v. Faltys*, 69 S.W.3d 315, 320 (Tex. App.—Austin 2002, no pet.).

A claim for breach of warranty derives from either the common law or from statute. *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex. 1991). Here, however, Contractors Source does not identify in its pleadings, in its response to the motion for summary judgment, or in its brief on appeal any specific warranty that Amegy has breached, except a general reference in its petition to "warranties . . . concerning [Amegy's] security systems and protocols." This is a claim for breach of warranty for services. A cause of action for breach of a warranty for services, whether express or implied, arises from the common law.

17

*See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995) (implied warranties); *Bell Tel.*, 811 S.W.2d at 574–75 (express warranties as creation of common law); *see also Rocky Mountain Helicopters, Inc. v. Lubbock Cnty. Hosp. Dist.*, 987 S.W.2d 50, 52–53 (Tex. 1998) (Texas has recognized "implied warranty for services only when the services relate to the repair or modification of existing tangible goods or property").

When the UCC applies, common-law claims that conflict with the UCC are precluded. *Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 624 (Tex. App.—Dallas 2005, no pet.); *see also Moody Nat'l Bank v. Tex. City Dev. Ltd. Co.*, 46 S.W.3d 373, 378 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (Chapter 4A precludes common-law remedies); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 235 (Tex. App.—San Antonio 2001, pet. denied). "To the extent they do not conflict with the Uniform Commercial Code's provisions, common law principles complement the Uniform Commercial Code." *Plano Lincoln Mercury*, 167 S.W.3d at 624; *see also* TEX. BUS. & COM. CODE § 1.103(b) ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions."); *Moody Nat'l Bank*, 46 S.W.3d at 378. In this case, Contractors Source seeks to obtain the same relief at common law that the Legislature has barred under the UCC. We therefore hold that Contractors Source's common-law claims are precluded.

## II. Motion to compel discovery

Finally, Contractors Source argues that the trial court abused its discretion in denying its motion to compel discovery. We review the trial court's denial of a motion to compel for abuse of discretion. *Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). An appellate court should reverse a trial court's ruling on a motion to compel only when the trial court acts in an arbitrary and unreasonable manner, without reference to any guiding principles. *Id.*

Amegy argues that Contractors Source failed to make clear exactly what information it sought. Amegy further contends that it produced all relevant information. Thus, according to Amegy, the trial court did not abuse its discretion.

In its motion to compel production, Contractors Source complained that Amegy had not produced "the schedule of fees and charges, or funds availability disclosures, or electronic transfer disclosures or any documents responsive to [Requests for Production Numbers] 2–7, or even all of [Amegy's] rules and regulations governing accounts . . . having omitted all of Sections 10K – Section 35 of the Rules . . . ." Contractors Source also complained that Amegy failed to produce recordings of phone calls related to verbal instructions on its account, despite the absence of any allegation that any such phone calls took place. It argued that these documents and recordings were relevant to "the issues of

improper transfers and forged checks from [Contractors Source's] account, the contract terms under which [Amegy] held [Contractors Source's] funds, whether [Amegy] was acting in good faith in making the transfers and payments, [Amegy's] exercise of ordinary care in making the transfers and payments and the bank's failure to exercise care and/or good faith as a contributing factor and/or the proximate cause of [Contractors Source's] losses." It concluded by arguing that it was entitled to "all missing financial information." In a separate brief in support of the motion, Contractors Source focused almost entirely on documents relating to security procedures and authentication protocols.

We cannot determine what several of Contractors Source's requests mean, nor can we determine how any of them are relevant to its claims in this suit. With the exceptions of Amegy's account rules and regulations and documents related to security procedures, Contractors Source did not explain the relevance of any of the information requested. With respect to the rules and regulations, the undisputed evidence shows that Contractors Source failed to give timely notice under the relevant statutes, and the parties agree that Amegy's rules and regulations shortened the timeframes involved, rather than lengthening them. Thus, the rules and regulations could not have helped Contractors Source survive summary judgment.

Moreover, Amegy responded to the motion to compel by arguing that it had produced copies of all account rules and regulations applicable to the Contractors Source account at any time. Amegy's Carrie Cogburn testified that the bank provided all relevant rules and regulations to Contractors Source when they became effective. Indeed, Amegy filed the rules in effect in November 2010 with its response to the motion to compel. Merri Brecher contends in her affidavit, filed months after the trial court denied the motion to compel, that Amegy never produced any such rules or regulations before filing its motion for summary judgment. But this was not before the trial court when it ruled on the motion to compel. We also note that the Brechers agreed to be bound by Amegy's Rules and Regulations Governing Accounts when they opened the Contractors Source account. In the absence of fraud, a party to a written agreement is presumed to have read and understood the agreement, and thus necessarily must have seen it. *NETCO, Inc. v. Montemayor*, 352 S.W.3d 733, 739 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

Contractors Source did not rebut this argument or identify any missing versions of portions of the rules. Further, we are unable to identify any copy of those rules and regulations in the record from which sections 10K through 35 are missing; indeed, not all versions of the rules and regulations in the record have numbered sections.

Similarly, security procedures are irrelevant to Chapter 4 claims, as the statutes related to security procedures apply only to Chapter 4A claims. *See* TEX. BUS. & COM. CODE §§ 4A.202(b)–(c). Because Chapter 4 governs Contractors Source's claims, Amegy's use of security procedures had no relevance.

The requests for production identified in the motion to compel do not identify any information requested with sufficient particularity that we can conclude that the trial court abused its discretion in denying discovery. Requests for production numbers 2 through 6 all asked for documents related to fraud detection, anomaly detection, authentication of orders, and other security-related measures. Contractors Source did not explain in its motion to compel why these documents are relevant to its claims in the absence of an agreed security procedure under Chapter 4A governing at least some of the transactions in question. Request for Production number 7 asked for "all documents identifying [Amegy's] online banking practices in 2007, 2008, 2009, 2010, 2011 and 2012." These documents have no relevance to this suit, as Contractors Source does not allege that any of the unauthorized transactions took place through Amegy's online banking services. On the contrary, the parties agree that Contractors Source never completed setup of online access to its Amegy account.

In light of Contractors Source's failure to identify with specificity the documents requested or the relevance of those documents to any claim or defense,

we hold that the trial court did not abuse its discretion in denying the motion to compel. *See Macy*, 294 S.W.3d at 651. We overrule Contractors Source's fourth issue.

## Conclusion

Because we have overruled all of Contractors Source's issues on appeal, we affirm the trial court's judgment.

<div style="margin-left: 50%;">

Michael Massengale
Justice

</div>

Panel consists of Justices Massengale, Brown, and Huddle.