**Opinion issued May 16, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00886-CV

———————————

## CADENCE BANK, Appellant

## V.

## ROY J. ELIZONDO III AND ROY J. ELIZONDO III PLLC, Appellees

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-65226**

---

### DISSENTING OPINION

I respectfully dissent. In this suit, appellant Cadence Bank sued appellee Roy J. Elizondo III and his law firm, Roy J. Elizondo III PLLC, to recover funds charged back to Elizondo by the bank when a cashier's check was dishonored that Elizondo had deposited and from which he had directed that funds be wire-

transferred to a foreign third party during the provisional settlement period. The trial court entered summary judgment in favor of Elizondo on common-law counterclaims and defenses he asserted against the bank in cross-motions for summary judgment. Cadence has appealed. The majority affirms. I would not.

The majority opinion contravenes the established rule of law that the Uniform Commercial Code (the UCC) preempts common-law claims and defenses that conflict with established principles of banking and commercial law. I agree with the majority that Elizondo breached both his deposit agreement with Cadence Bank (the Deposit Agreement) and the warranty he gave the bank pursuant to the UCC that the cashier's check he had deposited into his IOLTA account at the bank was good when he directed Cadence to transfer funds from his account to a foreign entity during the provisional settlement period. I do not agree with the majority that the wire transfer form, which stated that the funds had been transferred from a "verified collected balance," represented a separate and superseding agreement between Elizondo and Cadence in which Cadence made a false representation to Elizondo that overrode Cadence's right under the UCC to charge the funds back to Elizondo.

I would render judgment for Cadence.

**Facts**

This case is governed by the UCC and by Elizondo's Deposit Agreement with Cadence.

Section 4.214 of the UCC provides:

> If a collecting bank has made *provisional settlement* with its customer for an item *and fails by reason of dishonor*, suspension of payments by a bank, or otherwise *to receive settlement for the item* that is or becomes final, the bank *may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account*, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.

TEX. BUS. & COM. CODE ANN. § 4.214(a) (emphasis added).

Section 4.207(a) of the UCC provides, "*A customer* or collecting bank *that transfers an item* and receives a settlement or other consideration *warrants to the transferee and to any subsequent collecting bank that . . . the warrantor is a person entitled to enforce the item*" and that "*all signatures on the item are authentic and authorized.*" *Id.* § 4.207(a)(1)–(2) (emphasis added). Section 4.207(b) provides, "If an item is dishonored, a customer or collecting bank transferring the item and receiving settlement or other consideration is obliged to pay the amount due on the item (i) according to the terms of the item at the time it was transferred . . . ." *Id.* § 4.207(b). Finally, section 4.207(c) provides, "A person to whom the warranties under Subsection (a) are made and who took the item in good faith *may recover*

3

*from the warrantor as damages for breach of warranty an amount equal to the loss suffered* as a result of the breach . . . ." *Id.* § 4.207(c) (emphasis added). All of these provisions apply here.

Section 4.201 of the UCC further provides that "[u]nless a contrary intent clearly appears and *before the time that a settlement given by a collecting bank for an item becomes final, the bank, with respect to the item, is an agent or sub-agent of the owner of the item and any settlement given for the item is provisional. This provision applies . . . even though credit given for the item is subject to immediate withdrawal as of right or is in fact withdrawn . . . .*" *Id.* § 4.201(a) (emphasis added). However, "the continuance of ownership of an item by its owner and any rights of the owner to proceeds of the item are subject to rights of a collecting bank, such as those resulting from outstanding advances on the item and rights of recoupment or setoff." *Id.*

Elizondo and his law firm, Roy J. Elizondo III, PLLC (collectively, "Elizondo"), maintained an IOLTA account with Cadence Bank. The Deposit Agreement signed by Elizondo and Cadence expressly affirmed the plain language of the UCC. The Deposit Agreement specifically provided that any item accepted for deposit "may be subject to later verification and final payment" and that Cadence may "deduct funds from your account if an item is . . . returned to us unpaid . . . even if you have already used the funds." The Deposit Agreement also

4

stated, "Credit for any item we accept for deposit to your account . . . is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent." This provision of his Deposit Agreement with Cadence expressed Elizondo's understanding that the requirements of UCC sections 4.214(a), 4.207, and 4.201 applied.

The summary judgment record shows that it was Cadence's policy to provide a provisional credit pending final settlement of the check deposited by Elizondo and that Elizondo knowingly ordered funds to be transferred to a Japanese account during the period when the funds were only provisionally credited to his account. These practices complied with the UCC.

On Friday, September 19, 2014, a cashier's check was delivered to Elizondo's office, just as a putative new client Elizondo had never met in person said it would be. The check was payable to Elizondo in the amount of $496,850 and drawn on JPMorgan Chase Bank, N.A. Elizondo deposited the check into his IOLTA account with Cadence, and Cadence credited the account with provisional settlement funds.

On Tuesday, Elizondo contacted Cadence employee Shannon Yang-Oh and informed her that he needed to wire transfer a portion of the funds in his account to a third-party account in Japan. He sent Oh an email with the pertinent information, including the name of the receiving bank, the name of the beneficiary, and the

amount to be wired: $398,980. Oh informed Elizondo that she would "prepare [a] wire form and send it to [Elizondo] for a signature."

Oh emailed a wire transfer request form to Elizondo. The top half of the form consisted of fields already filled in with the information that Elizondo had provided Oh in his earlier email. The form included a signature box for Elizondo and a declaration stating:

> I understand that the bank makes no guarantees concerning the delivery of international wires. I also understand that I will be responsible for tracer fees if a problem arises or if the funds are returned. I will accept the net proceeds. I have been made aware that this process may take up to 10 business days.

The bottom half of the form contained blank fields to be filled in by Cadence after Elizondo had signed and submitted the form to the bank. These blank fields included a field for the amount of the "collected balance" in the account from which the wire transfer would be made and a field for the name of the "employee who verified [the] collected balance." Elizondo signed and emailed the form back to Oh. Oh then filled out and signed the two "collected balance" fields, indicating that the wire transfer would be made from a "collected balance" in the account of $497,643.89. Another Cadence employee, Sharita Baker, wrote in the margins of the form that $497,643.89 was Elizondo's "available balance," a term defined by the Deposit Agreement to mean the amount "available for immediate withdrawal."

Finally, Assistant Branch Manager Yolanda Villatoro signed the form as the approving officer.

Cadence employees testified by deposition that when they complete a wire transfer form, or otherwise provide information regarding account balances, they rely on the amount that is reflected in Cadence's computer system, and the "collected balance" in the computer system represents the end-of-day ledger balance, minus any debits, plus any credits from the previous day. Thus, "Collected funds is just a term that is used to identify a particular field within our system." This collected balance can include a provisional credit for a deposited check when any holds have been removed but the check still has not been finally paid. That was the case here. Moreover, both the deposit slip and the deposit receipt clearly disclosed that the deposit could be returned and was subject to the provisions of the UCC. And Elizondo's Deposit Agreement contained his express acknowledgement that any item accepted for deposit "may be subject to later verification and final payment" and that Cadence may "deduct funds from your account if an item is . . . returned to us unpaid . . . even if you have already used the funds."

On Wednesday, September 24, Cadence wire transferred $398,980 to the Japanese bank account using the provisional settlement funds that Cadence had credited to Elizondo's account. The cashier's check was subsequently dishonored

by Chase and returned to Cadence unpaid. Cadence notified Elizondo that the check had been dishonored, and it charged back the amount that had been provisionally credited to his account, resulting in a negative account balance of $398,980.

Cadence demanded that Elizondo repay the overdrawn funds. When Elizondo refused, Cadence sued Elizondo to recover the overdrawn funds, asserting claims for breach of Elizondo's Deposit Agreement and breach of warranty under the Texas UCC. *See* TEX. BUS. & COM. CODE ANN. § 4.207(a); *see also id.* §§ 4.201(a), 4.207(b)–(c), 4.214(a).

Elizondo raised defenses and filed a counterclaim against Cadence, alleging common-law causes of action for breach of contract, negligent misrepresentation, and fraud. He based his claims and defenses on the statement in the wire transfer request form that the funds were transferred from "a verified collected balance," arguing that the balance had not yet been "collected" as Elizondo was using the term, although the validity of the check had been provisionally verified by Elizondo himself, the bank had provisionally deposited the funds into his account, and these practices were fully compliant with the UCC provisions permitting a bank to charge back to its customer funds ordered transferred from the account by the customer during the provisional settlement period.

The parties filed cross-motions for summary judgment, and the trial court entered judgment for Elizondo.

## Analysis

### A.  Arguments of the parties

Cadence argues that the trial court erred in denying its motion for summary judgment because the evidence proves as a matter of law that Elizondo is liable for breach of warranty under the UCC and for breach of the parties' Deposit Agreement. Specifically, Cadence contends that by depositing a counterfeit check into his bank account Elizondo breached his warranties to Cadence under UCC section 4.207 that he was "entitled to enforce" the cashier's check he deposited and that "all signatures" on the check were "authentic and authorized." *See id.* § 4.207(a)(1)–(2). Cadence further contends that because it took the check "in good faith" it was entitled under section 4.207(c) to recover from Elizondo as damages the amount of the overdraft plus expenses. *See id.* § 4.207(c) (providing that warrantee who takes item in good faith may recover as damages amount equal to loss suffered from breach plus expenses).

Cadence further contends that it is entitled to charge back the provisional credit to Elizondo's account and to obtain a refund in the amount of the counterfeit check under UCC sections 4.201 and 4.214 and Article E, Sections 1, 2, and 14 of the Deposit Agreement with Elizondo. *See id.* § 4.201(a) (providing that bank

9

receives check as customer's agent and that settlement for check is provisional); *id.* § 4.214(a) (providing bank's right to charge back provisional settlement for dishonored check). Finally, Cadence contends that the UCC, supplemented by the Deposit Agreement, preempts Elizondo's common-law claims and defenses. Thus, Cadence contends the trial court erred in denying its motion for summary judgment on its claims for breach of warranty and breach of contract.

Elizondo does not dispute that he breached the transfer warranties of section 4.207 by depositing the counterfeit check. Nor does he dispute that the UCC and the Deposit Agreement entitle Cadence to charge back provisional settlement funds credited to an account for a check that is deposited but later dishonored by the drawee. However, Elizondo argues that his breaches did not cause Cadence's damages; they were caused by Cadence's superseding breach by representing the transferred funds on the transfer form as transferred from a "verified collected balance" during the provisional settlement period; therefore, Cadence is not entitled to recover the overdraft resulting from the charge-back in this case.

Accepting Elizondo's argument upends the carefully articulated terms of the UCC and the Deposit Agreement set out above in direct contravention of controlling law. Accordingly, I dissent.

10

## B.    Applicable law

Under Texas law, the UCC regulates a bank's relationship with its Texas customers. *See generally id.* §§ 3.101–.605 (negotiable instruments); *id.* §§ 4.101–.504 (bank deposits and collections); *id.* §§ 4A.101–.507 (funds transfers). "The relationship may also be governed in part by agreements between the bank and its customer, such as an agreement governing the processing of negotiable instruments presented to the bank." *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

The UCC "contains a comprehensive and carefully considered allocation of responsibility among parties to banking relationships." *Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 107 (Tex. 2004). It "must be liberally construed and applied to promote its underlying purposes and policies." TEX. BUS. & COM. CODE ANN. § 1.103(a). Those purposes and polices are "(1) to simplify, clarify and modernize the law governing commercial transactions; (2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and (3) to make uniform the law among the various jurisdictions." *Id.*; *see Sw. Bank*, 149 S.W.3d at 110.

The UCC also provides, "Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement [the UCC's] provisions." TEX. BUS. & COM. CODE ANN. § 1.103(b). However, "while principles

11

of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise." TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2 (emphasis in original)[1]; *see Contractors Source*, 462 S.W.3d at 138 ("To the extent they do not conflict with the Uniform Commercial Code's provisions, common law principles complement the Uniform Commercial Code.") (quoting *Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 624 (Tex. App.—Dallas 2005, no pet.)).

Thus, unless a specific provision of the UCC provides otherwise, the UCC "preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies." TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2. The UCC's preemptive effect "extends to displacement of other law that is inconsistent with the purposes and policies of the Uniform Commercial Code, as well as with its text." *Id.*

Chapter 4 of the UCC establishes the rights and duties between banks and their customers regarding deposits and collections. *See id.* §§ 4.101–.504; *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).

---

[1]   As the Fifth Circuit Court of Appeals has recently observed, "The UCC official commentary is an authoritative interpretation of the Code." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 960 n.5 (5th Cir. 2012). "Barring a contrary interpretation from the Texas courts, we are guided by the official commentary." *Id.*

12

Chapter 4 imposes certain warranty obligations on customers who deposit checks drawn on other banks, establishes the circumstances under which settlements for such checks are provisional, and gives banks the right to charge back such settlements in the event that the check is dishonored by the drawee bank.

Section 4.207 of the UCC imposes the warranty obligations. Under section 4.207, when a customer deposits a check into his bank account and receives a settlement or other consideration for the check, he makes certain warranties to the bank. TEX. BUS. & COM. CODE ANN. § 4.207(a). Those warranties include that the customer is "a person entitled to enforce the item" and that "all signatures on the item are authentic and authorized." *Id.* § 4.207(a)(1)–(2). These warranties "cannot be disclaimed with respect to checks." *Id.* § 4.207(d). If the customer breaches these warranties, a bank that took the check "in good faith" may recover from the customer as damages "an amount equal to the loss suffered as a result of the breach, but not more than the amount of the item plus expenses and loss of interest incurred as a result of the breach." *Id.* § 4.207(c).

Section 4.201 establishes the provisional status of settlements. Under section 4.201, when a bank collects on a check deposited by its customer, the bank acts as the customer's agent. *Id.* § 4.201(a). Unless a contrary intent clearly appears, any settlement given for the check is provisional until the settlement becomes final. *Id.*

Section 4.201 applies even if credit given for the check is subject to immediate withdrawal or is in fact withdrawn. *Id.*

Section 4.214 establishes a bank's right of charge-back. Under Section 4.214, if a customer deposits a check into his bank account and the bank credits the customer's account with provisional settlement funds, the bank may revoke the settlement and charge back the account if the check is later dishonored by the drawee. *Id.* § 4.214(a).

Finally, section 4.103 of the UCC states, in relevant part, that "[t]he effect of the provisions of this chapter may be varied by agreement." *Id.* § 4.103(a). The official comments explain that section 4.103 "confers blanket power to vary all provisions of the Article by agreements of the ordinary kind." *Id.* § 4.103 cmt. 2. "The agreement may be direct, as between the owner and the depositary bank; or indirect, as in the case in which the owner authorizes a particular type of procedure and any bank in the collection chain acts pursuant to such authorization." *Id.* As applicable here, section 4.103 provides that the terms of the UCC may be varied by a customer's deposit account agreement with a bank. However, Elizondo's Deposit Agreement was in accord with all of these UCC provisions.

C.  **The UCC preempts Elizondo's common-law and equitable defenses**

Contrary to Elizondo's argument and the majority's holding, principles of common law and equity cannot alter the "comprehensive and carefully considered

14

allocation of responsibility among parties to banking relationships." *See Am. Dream Team, Inc. v. Citizens State Bank*, 481 S.W.3d 725, 732 (Tex. App.—Tyler 2015, pet. denied) (citing *Sw. Bank*, 149 S.W.3d at 107, and *Martin*, 29 S.W.3d at 91). Accordingly, the UCC preempts common-law defenses to a bank's right to charge back provisional settlement funds. *See, e.g.*, *id.* (holding that depositor's claim that charge back breached deposit agreement was preempted by UCC); *Avanta Fed. Credit Union v. Shupak*, 223 P.3d 863, 871 (Mont. 2009) (holding that credit union's statutory charge-back rights were not subject to equitable estoppel).

The Texas courts have consistently followed this reasoning. *See Martin*, 29 S.W.3d at 91 (stating that UCC Chapter 4 establishes rights and duties between banks and their customers regarding deposits and collections); *Rodriguez v. NBC Bank*, 5 S.W.3d 756, 765 (Tex. App.—San Antonio 1999, no pet.) (holding that bank was entitled to charge item back to its customer's account after payor bank initially paid item but then subsequently reversed payment); *Bill Hart Auto Sales, Inc. v. Comerica Bank-Tex.*, 893 S.W.2d 705, 708 (Tex. App.—Eastland 1995, no pet.) (holding that when customer "authorized the transfer of the funds from its account, that authorization did not affect the Bank's right to charge-back the account for the provisional credit when the Bank failed to receive a settlement for the item from the drawee bank").

Elizondo ignores the plain language of the UCC, as well as his Deposit Agreement. He argues that the form requesting that funds be wire-transferred from his account to a third-party account constituted a subsequent enforceable agreement with Cadence. He contends that Cadence had a duty under the wire-transfer agreement to transfer the funds from a "verified collected balance"—which he construes as funds that have actually been collected and their collection verified, not funds that are only provisionally verified subject to settlement, in accordance with the bank's custom and practice and the UCC. He further claims that Cadence breached its duty, as set out in the wire-transfer agreement, by transferring funds without verifying whether the funds came from a "collected balance." He argues that if Cadence had fulfilled its duty and inquired into the "collected balance" prior to the wire transfer, it would have determined that he lacked sufficient funds in the account to complete the wire transfer and it would not have allowed the wire transfer with provisional funds from a check that had not been settled by Chase, the drawee bank. Elizondo contends that, if Cadence had not honored his wire transfer request until after it had collected the settlement funds from Chase, Cadence would simply have charged back the provisional credit to Elizondo with no loss to Cadence. Therefore, Elizondo argues, Cadence's damages were the result of Cadence's own actions. Elizondo also argues that Cadence's breach of the wire transfer agreement by completing the transfer with

only provisionally collected funds entitle him to offset the charge-back by the amount of the overdraft. The majority agrees with him.

This is not, however, how the law works, as it would nullify Elizondo's warranty that the funds represented by the cashier's check were good, his knowing request that the funds be transferred while only provisionally deemed collected, his acceptance of the risk that the funds would not ultimately prove collectible from Chase, and his agreement in the Deposit Agreement that, should the check be dishonored by Chase, Cadence could charge the overdraft back to him. In other words, Elizondo's argument—which the majority accepts—contradicts the terms of both the UCC and the Deposit Agreement he executed.

As the majority acknowledges, once the check was dishonored by Chase, Cadence was entitled to charge back the provisional settlement funds. See Slip Op. at 2 (citing TEX. BUS. & COM. CODE ANN. § 4.214(a)).

The majority, however, denies that section 4.214(a) controls this case, holding that, "by failing to transfer the funds from a 'verified collected balance,'" as it uniquely defines that term, Cadence "breached the parties' wire transfer agreement, thereby causing the overdraft and entitling Elizondo to offset the chargeback by the amount of overdrawn funds." Slip Op. at 2. This holding is contradictory to the plain language of both the UCC and the Deposit Agreement and depends entirely upon Elizondo's and the majority's own construction of the

17

term "verified collected balance," which is contrary to that used by Cadence in its ordinary course of business and is inconsistent with the purposes and text of both the UCC and the Deposit Agreement set out above. *See* TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2 ("[W]hile principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise.").

Elizondo and the majority argue, however, that the UCC does not necessarily preempt common-law defenses to a bank's right to recover an overdraft caused by a statutory charge back of provisional settlement funds. Slip Op. at 20. Relying on its own construction of terms and common-law principles, the majority "hold[s] that the parties entered into a valid, enforceable agreement to wire transfer funds from Elizondo's account to a third-party account in Japan and that the terms of that agreement are set forth in the wire transfer request form." Slip Op. at 24. It then holds that Cadence breached the contract by signing the blank on the wire-transfer agreement Elizondo had returned to the bank which stated that the funds were transferred from a "verified collected balance," when the funds in Elizondo's account had not been verified as actually being in the account, as opposed to being provisionally settled under Elizondo's warranty, and that Cadence therefore must bear the loss. *See* Slip Op. at 25–31. Notably, the only cases the majority cites in

18

support of its holding that Elizondo's claims against Cadence are *not* preempted by the UCC are cases from other states based on a bank's misrepresentation *to its customer*, not to itself on a wire-transfer form. *See* Slip Op. at 20 (citing cases).

In reaching its holding, the majority does exactly what the UCC prohibits: it relies on its own construction of terms and common-law principles that directly contradict the principles and text of the UCC.

Not only does *no* provision of the UCC provide otherwise, the Deposit Agreement Elizondo signed expressly affirms the plain language of section 4.214. The Deposit Agreement specifically provides that any item accepted for deposit "may be subject to later verification and final payment," and Cadence may "deduct funds from your account if an item is . . . returned to us unpaid . . . even if you have already used the funds." It also expressly states, "Credit for any item we accept for deposit to your account . . . is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent," and it was Cadence's policy to provide a provisional credit pending final settlement of the check.

In *Southwest Bank*, a similar case, the Texas Supreme Court refused to apply proportionate responsibility provisions of the Texas Civil Practice and Remedies Code by refusing to permit a bank to join an employee who deposited her employer's checks into her personal account at the bank as a responsible third

19

party in the employer's conversion action against the bank. *Id.* at 104–05. The court reasoned, "Were we to impose Texas's proportionate responsibility scheme on Revised Article 3 [of the UCC], parties litigating UCC-based conversion claims in Texas would face a unique liability scheme, overriding the UCC's express purpose of furthering uniformity among the states." *Id.* at 110. It further observed, "[T]he UCC is 'carefully integrated and intended as a uniform codification of permanent character covering an entire 'field' of law, [and] is to be regarded as particularly resistant to implied repeal.'" *Id.* at 111 (quoting TEX. BUS. & COM. CODE ANN. § 1.104 cmt. 1).

The situation in *Southwest Bank* is analogous to that in this case. Yet here, rather than following the Texas Supreme Court, the majority overrides UCC sections 4.201, 4.207, and 4.214, allowing the bank to charge back to the customer unpaid funds the customer ordered transferred during the time in which the funds were only provisionally collected, *and* Elizondo's Deposit Agreement expressly acknowledging that right of the bank under the UCC.

## Conclusion

I would hold that Cadence was entitled to summary judgment. Accordingly, I would reverse the trial court's judgment and render judgment for Cadence Bank.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Keyes, dissenting.