**Affirmed and Opinion filed November 30, 2023.**



**In the**

# Fourteenth Court of Appeals

**NO. 14-22-00469-CV**

## HARTMAN INCOME REIT MANAGEMENT, Appellant

**V.**

## SUMMER ENERGY, LLC, Appellee

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2021-31657**

## O P I N I O N

In February 2021, Winter Storm Uri caused blackouts across the state as low temperatures drove electricity demand up while simultaneously impairing the ability of power generators and transmitters to produce and deliver. From February 15th until mid-morning on the 19th, ERCOT,[1] the entity that operates Texas's electric-

---

[1] ERCOT is the acronym for the Electric Reliability Council of Texas.

power grid,[2] set the wholesale price of electricity at $9,000/MWh—the maximum then allowable.[3] Pursuant to its multiple "Real Time Index Full Pass Through" contracts with commercial-property owner Hartman Income REIT Management, retail electric provider Summer Energy, LLC, included these charges in Hartman's electric bills. Hartman refused to pay the full amount billed, arguing that ERCOT should have stopped imposing the high price thirty-three hours earlier than it did.

Summer sued Hartman for breach of contract, and Hartman countersued for breach of contract, breach of the duty of good faith, and declaratory relief. After a non-jury trial, the trial court denied Hartman's claims and held that the parties' unambiguous contracts required Hartman to pay a price for electricity that included the rate set by ERCOT. Hartman appealed, but we conclude that the trial court correctly construed the contracts and denied Hartman relief. Thus, we affirm the trial court's judgment.

## I. BACKGROUND

Appellant Hartman Income REIT Management owns and operates over fifty buildings, more than thirty of which are in Houston. Hartman obtains electricity for its properties through retail electric provider (REP) Summer Energy, LLC. REPs do not themselves generate energy;[4] rather, REPs like Summer "arrange for purchase and delivery of electricity" on a retail customer's behalf. This service is

---

[2] *See CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 612 (Tex. 2023) (structure of Texas's electric-utility industry requires ERCOT "to operate the wholesale electric market").

[3] The Public Utility Commission of Texas later lowered that cap to $5,000. *See* 16 TEX. ADMIN. CODE § 25.509(b)(6).

[4] *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 11, sec. 31.002(17), 1999 TEX. GEN. LAWS 2543, 2549 (amended 2021 & 2023).

administratively defined as an "electricity product," which is just a "specific type of retail electricity service developed and identified by a REP."[5]

In May 2020, Hartman entered into five contracts with Summer covering a total of forty-three properties; the contracts differ only in the addresses served. In each, Hartman purchased Summer's "Real Time Index Full Pass Through + $0.003660/kwh Retail Adder." Hartman agreed that one component of the Product's price would be the "Real Time Index Price."

The contracts do not define "Real Time Index Price." Hartman maintains that the term is ambiguous; Summer disagrees. Each side presented witnesses who testified that this term refers to the real-time energy rate that ERCOT reports at 15-minute intervals; neither side presented controverting evidence. Hartman stipulated that this component of its electricity bills accurately reflects the real-time prices published by ERCOT. Moreover, Hartman does not contest the parts of Summer's bills that include the $9,000/MWh imposed by ERCOT from February 15th through nearly all of February 17, 2021, but Hartman maintains that ERCOT should have stopped imposing the market cap at 11:55 p.m. on February 17th rather than at approximately 9:00 a.m. on February 19th. Hartman contends that the "Real Time Index Price" referred to in its contracts with Summer must be an index that sets prices according to a pre-defined formula, and because ERCOT did not follow a pre-defined formula during those hours, Summer was not permitted to pass through those charges. Hartman additionally pleaded that Summer breached a duty of good faith by billing Hartman for those charges.

---

[5] 16 TEX. ADMIN. CODE § 25.5(39).

After a nonjury trial, the trial court concluded that the contracts' pricing provisions were unambiguous. The trial court ruled in Summer's favor and against Hartman.

## II. ISSUES PRESENTED

In three issues, Hartman argues that the trial court erred in (a) its construction of the parties' contracts, (b) considering extrinsic evidence at trial even though the trial ultimately concluded that the contracts are unambiguous, and (c) failing to find that Summer breached a duty of good faith.

## III. CONSTRUING THE CONTRACTS

When construing a contract, we apply the de novo standard of review. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019). Our primary objective is to effectuate the written expression of the parties' intent. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd*., 574 S.W.3d 882, 889 (Tex. 2019). To do so, we "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). We do not consider a provision in isolation and give it controlling effect; rather, we consider each provision in the context of the contract as a whole. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). We give the contract's words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.* Ordinarily, the writing alone is sufficient to express the parties' intentions, "for it is objective, not subjective, intent that controls." *Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam) (quoting *City of Pinehurst v. Spooner Addition Water Co*., 432 S.W.2d 515, 518 (Tex. 1968)).

4

Whether a contract is ambiguous is a question of law. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022). We will conclude that a contract is ambiguous only if, after applying the pertinent rules of construction, it is subject to more than one reasonable interpretation. *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 340, 344 (Tex. 2023). If the contract can be given a definite legal meaning or interpretation when considered as a whole, and in light of the objective circumstances surrounding its execution, then the contract is not ambiguous, and we will construe it as matter of law. *See id.* Evidence of the objectively determinable facts and circumstances surrounding the contract's formation—including commercial setting, trade custom, and trade usage—may inform the meaning of the language chosen even in an unambiguous contract. *See id.* We also may consider the parties' sophistication and the participation of legal counsel, "which carry an expectation that the parties were aware of what to bargain for and understood the terms of their written agreement." *Id.* But extrinsic evidence may only give the parties' words "a meaning consistent with that to which they are reasonably susceptible"; it "cannot contradict, change, enlarge, or supplement the contract language." *Id.* at 345.

## A.    Summer's Indexed Products Described

Hartman purchased Indexed Products, and in the pivotal language of the product description, the parties agreed that

> Indexed Products have a price that changes according to a pre-defined pricing formula that is based on publicly available indices or information.[6]

---

[6] The Public Utility Commission similarly defines an "indexed product" as "[a] retail electric product for which the price, including recurring charges, can vary according to a pre-defined pricing formula that is based on publicly available indices or information and is disclosed to the customer . . . ." 16 TEX. ADMIN. CODE § 25.475(b)(6). Although section 25.475 was amended effective January 6, 2022, this language has not changed.

5

Hartman argues that this provision means that the "indices or information" must be calculated "according to a pre-defined pricing formula." According to Hartman, Summer cannot rely on the prices set by ERCOT on February 18th and 19th of 2021 when calculating Hartman's bills for those hours, because ERCOT did not follow a pre-defined formula during that time, instead setting wholesale electricity prices at the maximum permissible. But, simply parsing the syntax and grammar of the sentence's plain language shows that Hartman's interpretation reverses the relationship between "pre-defined pricing formula" and "publicly available indices or information." *See, e.g.*, *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, No. 22-0901, 2023 WL 7238791, at \*2 (Tex. Nov. 3, 2023) (per curiam) (competing constructions turned on "the syntactic issue" of identifying the part of a sentence to which a modifier applied); *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (courts read contractual words and phrases "in context and in light of the rules of grammar and common usage").

The relative pronoun "that" introduces a restrictive clause specifying that the Indexed Products' price "changes according to a pre-defined pricing formula." This clause applies only to the preceding noun "price"; it does not modify words that appear later in the sentence.[7] Within this clause, the word "formula" is modified by the adjective phrase "pre-defined pricing," so the formula Summer will use to calculate its Indexed Products' price will be pre-defined, that is, the formula will be defined before Summer begins rendering services for which it charges a "price." This clause tells us that, rather than agreeing that Summer will always charge the

---

[7] "Relative pronouns require an antecedent—that is, a preceding noun—to which they refer," because the restrictive clause that *follows* the relative pronoun modifies the noun that most closely *precedes* the relative pronoun. *See A.S. Horner, Inc. v. Navarrette*, 656 S.W.3d 717, 722 (Tex. App.—El Paso 2022, no pet.) (sub. op. on denial of reh'g) (citing BRYAN GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE, §§ 10.9 & 10.10, at 178–79 (3d ed. 2013)).

same pre-defined price for electricity throughout the life of the contract, the parties instead agree that Summer will always use the same pre-defined formula to calculate the price.

"Pre-defined pricing formula" is followed by the word, "that," and again, it introduces a restrictive clause modifying the immediately preceding noun. Thus, the clause that follows the word "that" restricts the meaning of the "pre-defined pricing formula" that Summer will use to calculate its Indexed Products' price. This clause tells us that Summer's pre-defined pricing formula "is based on publicly available indices or information." The words "indices or information" are modified only by the adjective phrase, "publicly available."

Putting all of this together, this sentence's modifiers impose four requirements on Summer's Indexed Products' price. First, although the price of Summer's Indexed Products is variable, Summer must always calculate that price using the same formula. Second, this pricing formula must be "pre-defined," that is, before Summer provides services for which it charges Hartman. Third, Summer's pre-defined pricing formula must be based on indices or information. And fourth, the "indices or information" used in Summer's pre-defined pricing formula must be "publicly available."

This provision is unambiguous. Contrary to Hartman's contentions, it does not require *a third party*—ERCOT—to use a pre-defined formula to calculate the prices published in that entity's publicly available indices or information; it requires only that *Summer* use a pre-defined formula when calculating the prices it charges Hartman under the contract. "Pre-defined pricing formula" cannot be read to restrict the meaning of "indices or information," because "pre-defined pricing formula" precedes the words "indices or information" in the sentence.

7

## B. The Pre-Defined Pricing Formula

Our next step is to identify the pre-defined pricing formula to which the parties agreed. Although some witnesses testified that the pre-defined pricing formula is not in the contracts, the construction of an unambiguous contract is a question of law, and neither the witnesses nor the court can vary its terms. *See Finley Res.*, 672 S.W.3d at 345 (surrounding circumstances "can neither change what the contract says nor create an ambiguity"). And on this issue, the Agreements are again unambiguous.

On the first page of the contracts, the parties agreed that "current pricing for service is indicated in your Contract Confirmation." The Contract Confirmation page then identifies the specific product purchased and sets forth the formula for calculating the product's price, as follows:

**Product:** **REAL TIME INDEX FULL PASS THROUGH + $0.003660/kwh Retail Adder**

. . .

**Pricing**: The price for the term of the contract is composed of:

i. The sum of the Real Time Index Price, plus Line Losses, plus Ancillary Services, plus nodal basis, plus the retail adder multiplied by the total kilowatt hours of energy. You will be assessed a monthly base charge of $0.00; plus

ii. All TDSP[8] charges, non-bypassable charges, taxes and other fees.

This is a formula; it is pre-defined; and it used to calculate the price that Hartman agreed to pay Summer for the Indexed Products Hartman purchased. In accordance with the name of the product, the pre-defined pricing formula specifies that Summer

---

[8] "TDSP" means "transmission and distribution utility." With certain exceptions, a TDSP is an entity "that owns or operates for compensation in this state equipment or facilities to transmit or distribute electricity." TEX. UTIL. CODE § 31.002(19).

will "pass through" the publicly available Real Time Index Price to Hartman. Like the description of Summer's Indexed Products generally, nothing on the Contract Confirmation page—or anywhere in the parties' contracts—requires the "Real Time Index Price" to be calculated according to a pre-defined formula. Indeed, the contract contains no representations at all about how the "Real Time Index Price" is calculated.

To construe the contract, all that remains to do is to identify the "Real Time Index Price."

## C. The "Real Time Index Price"

The Agreements do not define "Real Time Index Price." Although Hartman asserts that this means the term is ambiguous, the mere absence of a contractual definition does not render a term ambiguous. "Real Time Index Price" is ambiguous only if, after applying the available interpretive tools, it is objectively subject to more than one reasonable meaning. *See, e.g.*, *U.S. Polyco*, 2023 WL 7238791, at *5 n.1; *Finley Res.*, 672 S.W.3d at 344.

Here, however, the evidence conclusively established that "Real Time Index Price" is the price of electricity in a given location as reported by ERCOT in fifteen-minute intervals.

It is so well-established in the Texas electric industry that an "indexed product" is one that passes through the real-time prices set by ERCOT that this usage is now memorialized in the Texas Utilities Code. Section 39.110(a) states that "'wholesale indexed product' means a retail electric product in which the price a customer pays for electricity includes a direct pass-through of real-time settlement point prices determined by the independent organization certified under Section 39.151 for the ERCOT power region." TEX. UTIL. CODE § 39.110(a). ERCOT is the

9

independent organization certified by the Public Utility Commission to perform certain mandatory functions. *See* TEX. UTIL. CODE § 39.151 (requiring PUC to certify such an organization); 16 TEX. ADMIN. CODE § 25.361(b) (certifying ERCOT as that organization). And in particular, ERCOT is required to "disseminate information relating to . . . market prices." 16 TEX. ADMIN. CODE § 25.361(b)(14).

All of the witnesses who were asked to identify the "Real Time Index Price" did so in a manner that conforms to section 39.110(a). The trial court properly considered their testimony, which, far from varying the contract's terms, as would be the case with parol evidence, demonstrated that "Real Time Index Price" is objectively susceptible of only one reasonable meaning. *See Finley Res.*, 672 S.W.3d at 344 ("Commercial setting, trade custom, and trade usage are objective surrounding circumstances that may shed light on the meaning of contract language.").

As Summer's chief supply officer Travis Andrews succinctly stated, "Realtime index is a price published by ERCOT that changes every 15 minutes based upon the actual running conditions at that point in time." Andrews affirmed that "realtime energy prices" are "just the price set by ERCOT."

Gilbert Okoronkwo, Summer's director of sales, similarly testified that "[e]very 15 minutes there's a price set by ERCOT" and that Hartman's electric bills include this "Realtime Locational Margin Price." Jeremy Wallace, Summer's vice president of sales, likewise testified that Summer obtains the realtime index price from ERCOT.

The testimony of Hartman's corporate representive Shane Cawood reflected the same understanding of "Real Time Index Price." Cawood is Hartman's director of operations over asset services, and he manages Hartman's electricity contracts. When asked, "And this realtime index, who sets those prices," Cawood answered,

10

"I believe that it's ERCOT. They at least report it." When asked where one would find the energy rate in a realtime index contract, Cawood said, "I could find that through ERCOT." He explained that in a "realtime index full pass through" contract, "the REPs [i.e., retail energy providers] pass through their portion of the energy rate that's based off of the realtime market rate." The trial court asked Cawood to repeat this, and Cawood said, "the reps, like Summer Energy, for that portion of your bill, the energy rate that's based on the realtime pricing in 15-minute increments, they pass on their portion of that cost." He agreed that the realtime index pass through contract "is based on the index prices set by ERCOT." Cawood's testimony accords perfectly with the statutory definition of a "wholesale indexed product."

In sum, uncontroverted objective evidence of the commercial setting and trade usage established that "Real Time Index Price" can reasonably refer only to a given location's electricity prices as reported in fifteen-minute intervals by ERCOT.[9] We conclude that the contracts unambiguously require Summer to "pass through" that price.[10]

Hartman offers no alternative. The crux of Hartman's argument is that the definition of "Indexed Product" requires the Real Time Index Price to be set according to a pre-defined formula, and because ERCOT did not follow a pre-

---

[9] Hartman contends that the trial court must have impermissibly relied upon the parties' course of performance in construing the contract. *See Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019) ("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine its meaning."). In support of this position, Hartman points out that the trial court concluded that the contracts' "pricing terms are not ambiguous," but nevertheless found that "Hartman had Real Time Index Price contracts prior to the current dispute, and Hartman has remained on Real Time Index Price contracts since the dispute." Because the contracts are unambiguous as a matter of law, we disregard this finding as immaterial. *See Arriaga v. Cartmill*, 407 S.W.3d 927, 931 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (disregarding trial court's immaterial finding).

[10] Given the evidence summarized above, we would agree with the trial court's construction of the contracts even if we concluded that the contracts were ambiguous.

defined formula during the thirty-three hours at issue, ERCOT's real-time posted prices ceased to be the Real Time Index Price during that time. But as we demonstrated at the start of this analysis, the parties did not agree that the Real Time Index Price would follow a pre-defined formula.

Moreover, we construe a contract as a whole, and the and the contracts for Summer's Indexed Products allocate the risk of price volatility. For example, had Hartman chosen a fixed-price contract, then Summer would bear the risk of a dramatic price increase, such as occurred in February 2021. But Hartman chose Indexed Products and agreed that Summer would "pass through" ERCOT's prices to Hartman. As between Summer and Hartman, the Indexed Products allocated the risk of a dramatic price increase to Hartman. We cannot rewrite the parties' contracts to reverse that allocation. *See LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 240 (Tex. 2014) ("Risks of economic loss tend to be especially well suited to allocation by contract. . . . A contract that settles responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done." (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR ECONOMIC HARM, § 1 cmt. c (Tentative Draft No. 1))).

Hartman acknowledges in its brief that ERCOT is "the entity that posts prices to the Real Time Index Price [sic]" and "ERCOT held the price at the offer cap of $9,000 per MWh" throughout the thirty-three hours included in the challenged invoices. These facts are beyond dispute. But, in arguing that it should instead "pay an amount based on the true real time market energy price, not the unlawful price reported by ERCOT," Hartman overlooks that, for as long as ERCOT held the wholesale price to $9,000/MWh, that remained the de facto market price. As Carrie Bivens, the director of the ERCOT independent market monitor Potomac Economics, testified, ERCOT "manually intervene[d] to ensure the price was

12

$9,000." There is no evidence that, during those hours, there was some other market in which Summer could have purchased electricity for Hartman's use at a lower price. And even if that had been possible, the parties' contracts required Summer to adhere to its pre-defined pricing formula, and that formula requires Summer to use the publicly available Real Time Index Price.

We overrule Hartman's first and second issues.

## IV. DUTY OF GOOD FAITH

In its third issue, Hartman argues that Summer breached a duty of good faith under the Uniform Commercial Code (UCC). The UCC provides that "[e]very contract . . . imposes an obligation of good faith in its performance and enforcement." TEX. BUS. & COM. CODE § 1.304. The law presumes that contracting parties act in good faith. *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 135 (Tex. App.—Houston [1st Dist.] 2015, no pet.). As used here, "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM. CODE § 1.201(b)(20).

The UCC does not create an independent cause of action for breach of the duty of good faith. Rather, section 1.304's obligation of good faith means that if a party fails "to perform or enforce, in good faith, a specific duty or obligation under the contract," then that party has breached the contract, or in some circumstances, loses a remedial right or power. *Id.* § 1.304 cmt. 1. As the party with the burden of proof on this issue, Hartman must demonstrate on appeal that the evidence conclusively established, as a matter of law, that Summer breached the contract by failing in this duty. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

13

Hartman begins by asserting that Summer breached a duty of good faith by charging the prices posted by ERCOT, that is, by "passing through" the prices published in the "Real Time Index Price." But, this is precisely what Hartman agreed to. The contracts left Summer no discretion to deviate from the pre-defined pricing formula, and Summer has no control over the Real Time Index Price. Thus, the authorities Hartman cites concerning contracts in which some provision rests on one party's discretion are inapposite.[11]

Hartman next contends that Summer breached its duty of good faith by failing to challenge the prices that ERCOT posted to the Real Time Index during the hours in dispute.[12] Specifically, Hartman suggests that Summer could have sued ERCOT; however, ERCOT has sovereign immunity from suit. *See CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 621 (Tex. 2023). Alternatively, Hartman states that market participants, such as Summer, can seek the PUC's review of "a new or amended ERCOT rule." *See* 16 TEX. ADMIN. CODE § 25.362(c)(4). But, Hartman has not shown that Summer had a duty to seek such review.

The UCC's requirement of good faith could not create such a duty. "The UCC defines duties that grow out of specific contract terms and obligations." *Apache Corp. v. Dynegy Midstream Servs., Ltd. P'ship*, 214 S.W.3d 554, 563 (Tex. App.— Houston [14th Dist.] 2006), *aff'd in part, rev'd in part on other grounds*, 294 S.W.3d

---

[11] *See, e.g.*, TEX. BUS. & COM. CODE § 2.305(b) ("A price to be fixed by the seller or by the buyer means a price for him to fix in good faith."); *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 435 (Tex. 2004) (construing that provision); *Price v. Spielman Motor Sales Co.*, 261 A.D. 626, 629, 26 N.Y.S.2d 836 (App. Div. 1941) (dealer who reserved the right to reappraise a trade-in vehicle must reappraise in good faith); *Umlas v. Acey Oldsmobile, Inc.*, 62 Misc. 2d 819, 821, 310 N.Y.S.2d 147, 149 (Civ. Ct. 1970) (same); Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 HARV. L. REV. 369, 383 (1980) (the "good faith performance doctrine" means that when a contract is subject to a condition within one party's effective control, the party must exercise that control in good faith).

[12] Summer challenged ERCOT's charges for Ancillary Services but was unsuccessful. It did not challenge the prices ERCOT posted to the Real Time Index.

164 (Tex. 2009). It does not create new obligations but "merely governs the conduct by which the party must fulfill the contractual obligation to which it applies." *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 370 (Tex. 2019). Thus, the UCC's good-faith standard must be tied to a specific contractual duty or obligation. *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606–07 (Tex. 1998) (op. on reh'g). Absent a specific contractual obligation, the UCC's good-faith requirement is inapplicable. *Barrow-Shaver Res. Co*, 590 S.W.3d at 490.

"Because disregard of a contractual right is an element of the test" of good faith, Hartman "must point to some provision in the contract" obligating Summer to challenge the prices posted to the Real Time Index Price. *See Commercial Nat'l Bank of Beeville v. Batchelor*, 980 S.W.2d 750, 753 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). But there is no such contractual provision, nor does Hartman contend otherwise.

We overrule Hartman's third issue.

## V. CONCLUSION

In purchasing Indexed Products from Summer, Hartman unambiguously agreed that Summer would pass through to Hartman the real-time electricity prices reported by ERCOT. Summer had no obligation to Hartman to challenge those prices but is instead entitled to enforce the contracts as written. We accordingly affirm the

trial court's judgment without addressing Hartman's arguments about the propriety of the prices ERCOT set during Winter Storm Uri.



/s/     Tracy Christopher
        Chief Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Hassan.